In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00073-CV


______________________________




HENRY J. N. TAUB, H. BEN TAUB,


HENRY J. N. TAUB, II, KITCHCO REALTY, LTD.,


MARCY TAUB, AND METCO PETRO, LTD., Appellants



V.



HOUSTON PIPELINE COMPANY AND


HPL RESOURCES COMPANY, Appellees




 


On Appeal from the 80th Judicial District Court


Harris County, Texas


Trial Court No. 98-58066A




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Justice Ross



O P I N I O N



 Henry J. N. Taub, H. Ben Taub, Henry J. N. Taub, II, Kitchco Realty, Ltd., Marcy
Taub, and Metco Petro, Ltd. (collectively, the Taubs) appeal from a summary judgment
granted in favor of Houston Pipeline Company and HPL Resources Company (collectively,
HPL). Enron Oil & Gas Company was an additional defendant, but the Taubs settled with
Enron before this appeal.

Background


 This case concerns a 254-acre tract of land in northern Harris County overlaying the
Bammel Field, a natural gas field discovered in the 1930s. The Taubs owned the surface
rights. By the 1960s, Houston Natural Gas Production Company owned the Bammel Field. 
The Bammel-Cockfield sand, an oil and gas reservoir approximately 6,200 feet below the
surface, had been substantially depleted. Houston Natural Gas desired to turn this
depleted reservoir into a natural gas storage facility, and to accomplish this, needed to
unitize the oil and gas leases, and required additional rights to use the surface in ways that
exceeded its rights under the oil and gas leases. 

 Houston Natural Gas, along with the lessors of oil and gas leases, and the Taubs
entered into two agreements. The first was the Unit Agreement, which unitized the oil and
gas leases, permitting Houston Natural Gas to utilize the Bammel-Cockfield sand for gas
storage. The second was the Collateral Agreement, out of which this dispute arose.

 Under the Collateral Agreement, finalized September 15, 1966, Houston Natural
Gas relinquished all surface rights under the oil and gas leases, except the right to use
designated two-acre well sites located immediately around the actual drilling locations and
related surface easements, so long as these sites were used for certain specified
operations.

 The Taubs contend that, as a result of the Collateral Agreement, the operators had:

 determinable fee estates permitting use of the 2-acre wellsites and related
easements, and each estate automatically terminated when a site was no
longer used for storage or other operations. By entering into the Collateral
Agreement, and in exchange for agreeing to the Unit Agreement and
creation of a gas storage facility beneath their surface, the surface owners
[Taubs] immediately recovered most of their surface rights and limited the
Operator's remaining interest to determinable fee estates in specific 2-acre
wellsites and related easements. 


 The Collateral Agreement provided that, after September 1, 1972, any well site on
the property not used by the operator for "drilling, reworking, storage, injection,
repressuring, or production, during any period of 365 consecutive calendar days with
respect to a Unit Well used for Unit Operations . . . Operator's right to use said Wellsite
shall automatically terminate . . . ." The Collateral Agreement further provided that, if there
was not an oil, gas, disposal, or injection well on one or more well sites on September 1,
1973, the operator's right to use such well sites "shall automatically terminate." Further,
within ninety days after termination, the operator was to plug and cement any well, remove
all equipment and facilities, level and clean the surface, and file an instrument
acknowledging termination. Henry Taub, designated in the agreement as the
"Landowners' representative," was to be sent a copy of each such filed instrument within
fifteen days after the document was returned to the operator by the county clerk.

 In 1971, Houston Natural Gas filed a "Partial Release of Surface Under Oil, Gas and
Mineral Leases," as provided in the Collateral Agreement. This released all of Houston
Natural Gas' interests in the surface except for the following: well sites, designated as 3M,
5M, and 6M; a heater site, designated as 4M; pipeline easements, designated as 7M, 8M,
and 9M; and a roadway easement, designated as 1M (see Appendix A). 

 HPL acquired the interests of Houston Natural Gas around 1988 and continued its
operations in the area. As reflected in responses to requests for admissions, sometime
before February 1, 1990, the 4M and 5M sites were not used for "drilling, reworking,
storage, injection, repressuring, or production" for 365 consecutive calendar days during
the period between February 1, 1988 and January 31, 1990. HPL did not plug the well,
remove all equipment, clean the surface, or file the documentation required by the
Collateral Agreement. The 5M well was not plugged until April 8, 1994. 

 In 1993, HPL assigned its nonstorage rights in the Bammel Field to Enron, which
wanted to drill a new well at a new site near the 5M site. Because of the Collateral
Agreement and a partial release signed in 1971, Enron was required to obtain from the
Taubs a new surface site for its well. In November 1993, Enron's employee, Warren Davis,
approached Henry Taub about obtaining a new site. Henry Taub asserts in his deposition
that, even though the rights to use 4M and 5M had actually terminated, he was personally
unaware of the termination because the well had not been plugged and he had not
received the notice required under the Collateral Agreement. He further testified he
entered into negotiations with Enron, believing HPL and Enron still had rights regarding the
4M and 5M sites. In these negotiations, Davis proposed to Henry Taub that Enron enter
into a new surface agreement with the Taubs for a two-acre well site, in exchange for
Enron arranging for the release of the 5M site back to the Taubs. 

 At the Taubs' request, Enron had two surveys made of the 4M and 5M sites, one
in January 1994 and one in April 1994. The Taubs suggest the sites are falsely labeled
on the surveys as "existing" sites. 

 On the "release" of the 5M well site, the Taubs entered into a new Surface Use
Agreement with Enron on June 22, 1994. Enron drilled two new deep wells at this location. 
Henry Taub testified that, had he known the 4M and 5M sites had already been
abandoned, he would not have entered into the surface agreement with Enron. Further,
in July 1998, HPL removed a twelve-inch pipeline from the 7M and 8M rights-of-way and
installed a twenty-inch pipeline.

 An agreement and several supplements to that agreement, entered into between
the Taubs, Enron, and HPL in May 1996 tolled the statute of limitations until December 4,
1998, for any litigation by the Taubs.

 On December 4, 1998, the Taubs sued HPL and Enron, asserting claims arising
from the Collateral Agreement. Generally, the Taubs claimed: 1) HPL lost its lease rights
to three surface sites, 4M, 5M, and 6M, and became a trespasser by failing to use them
for drilling, reworking, storage, injection, repressuring, or production for a 365-day
consecutive period; 2) HPL breached the lease agreement as to two other surface sites,
7M and 8M, by replacing a twelve-inch pipeline with a twenty-inch pipeline; and 3) HPL
fraudulently induced the Taubs to enter into a separate surface agreement with Enron. 
Causes of action asserted by the Taubs included a declaratory judgment that HPL's right
to use the surface had terminated, breach of contract, fraud, trespass, breach of fiduciary
duty, and breach of the covenant of good faith and fair dealing.

 The trial court signed an interlocutory order on November 27, 2000, granting HPL's
motion for summary judgment. The order disposed of all the Taubs' claims against HPL. 
The order granted Enron's motion for summary judgment on all the Taubs' claims, except
those related to the 6M well site. The Taubs' motion for summary judgment was denied. 
On December 19, 2000, the Taubs moved for reconsideration of the trial court's
interlocutory order, alleging, among other things, that new deposition testimony had been
obtained which proved portions of HPL's evidence to be false. The Taubs also moved for
severance of the claims disposed of by the summary judgment. The motion for
reconsideration was denied, but the severance motion was granted, making the
interlocutory summary judgment order final. 

Issues


 The claims asserted by the Taubs in the trial court that are the subject of this appeal
include: 1) breach of the Collateral Agreement by HPL with respect to the 4M and 5M
sites; 2) HPL's fraud and conspiracy to commit fraud related to the 1994 Surface Use
Agreement with Enron, and related to the 1994 drill site and the 2M site; 3) breach of the
Collateral Agreement by HPL with respect to the 6M site; and 4) trespass by HPL with
respect to the 4M and 5M sites, the 6M site, and by the installation of the twenty-inch
pipeline on the 7M and 8M sites. 

 The overriding issue in this appeal, as contended by the Taubs, is whether the
district court erred by granting summary judgment in favor of HPL and then erred by
refusing to reconsider the summary judgment. They contend the resolution of this issue
turns on: 1) whether, after HPL's determinable fee estates terminated, the Taubs should
have regained title to and possession of the surface sites; 2) whether, after HPL's
determinable fee estates terminated, HPL breached the Collateral Agreement by failing to
plug wells, remove facilities and equipment, clean the sites, file instruments acknowledging
the terminations, and notify the Taubs; 3) whether HPL committed fraud, or conspired with
Enron to commit fraud, by inducing the Taubs to enter into a Surface Use Agreement
granting Enron the right to use two acres to drill new wells; 4) whether HPL trespassed on
the surface sites by continuing to occupy them after the determinable fee estates
terminated; 5) whether HPL exceeded its rights under the Collateral Agreement and
trespassed by replacing a twelve-inch pipeline and installing a twenty-inch pipeline, or by
transporting nonunit gas through the pipeline; and 6) whether the Taubs' breach of contract
and trespass claims are barred by the statute of limitations. 

 The trial court granted HPL's motion for summary judgment and dismissed the
Taubs' claims with prejudice, without specifying the reasons for its action. As an issue on
appeal, the Taubs contend generally the trial court erred in granting summary judgment in
favor of HPL and against them. This is sufficient to preserve this point for appeal and
allows the Taubs to argue all possible grounds on which summary judgment should have
been denied. See Malooly Bros. v. Napier, 461 S.W.2d 119, 121 (Tex. 1970); In re
Marriage of Ham, 59 S.W.3d 326, 330-31 (Tex. App.-Texarkana 2001, no pet.). 

Summary Judgment Standard of Review


 Summary judgment provides a method of summarily terminating a case when it
clearly appears that only a question of law is involved and that there is no genuine fact
issue. Cuyler v. Minns, 60 S.W.3d 209, 214 (Tex. App.-Houston [14th Dist.] 2001, pet.
denied); Hock v. Salaices, 982 S.W.2d 591, 593 (Tex. App.-San Antonio 1998, no pet.). 
Under the traditional summary judgment standards, the party moving for summary
judgment carries the burden of establishing that no material issue of fact exists and that
it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop.
Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985); Walston v. Lockhart, 62 S.W.3d 257, 258
(Tex. App.-Waco 2001, pet. filed); Cuyler, 60 S.W.3d at 214. When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant, and we indulge every
reasonable inference and resolve any doubts in the nonmovant's favor. On appeal, the
movant still bears the burden of showing that there is no genuine issue of material fact and
that the movant is entitled to judgment as a matter of law. Nixon, 690 S.W.2d at 548;
Walston, 62 S.W.3d at 258; Cuyler, 60 S.W.3d at 214. Summary judgment is reviewed de
novo. Walston, 60 S.W.3d at 258. Where the trial court does not specify the grounds on
which it granted summary judgment on each of the causes of action, summary judgment
will be affirmed if any of the theories advanced are meritorious. Lang v. City of
Nacogdoches, 942 S.W.2d 752, 757 (Tex. App.-Tyler 1997, writ denied).

Breach of Contract

 The elements of a breach of contract claim are: 1) existence of a valid contract; 2)
performance or tendered performance by the plaintiff; 3) breach of the contract by the
defendant; and 4) damages to the plaintiff resulting from the breach. Wright v. Christian
& Smith, 950 S.W.2d 411, 412 (Tex. App.-Houston [1st Dist.] 1997, no pet.). HPL
contended in its motion for summary judgment that the statute of limitations bars the
Taubs' breach of contract claims and also contended that it established as a matter of law
the Taubs were not damaged by the alleged breach of contract, one of the essential
elements of their cause of action.

 HPL, as the movant for summary judgment, had the burden of establishing by
competent summary judgment evidence that there was no genuine issue of material fact
as to one or more essential elements of the plaintiff's cause of action. See Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 474 (Tex. 1995). HPL cites Modern Exploration, Inc. v.
Maddison, 708 S.W.2d 872 (Tex. App.-Corpus Christi 1986, no pet.), involving the failure
of the holder of a mineral lease to timely commence the drilling of a well under the terms
of the lease. The lessor counterclaimed for damages based on the failure of the lessee
to release the acreage on which the lease had terminated. The effect of this inaction was
to create a cloud on the title to the property. A suit to remove the cloud from the title is an
equitable remedy, providing for no award of damages. The court found damages may be
recovered in such instances for "slander of title," but in order to prove such damages, the
plaintiff would have to prove the loss of a specific, subsequent sale. Id. at 877. The court
stated, "[W]e are unwilling to hold that either a contractual or common-law duty to release
acreage under a terminated mineral lease, by itself, creates an action for damages absent
proof of the loss of a specific sale." Id. (emphasis added); see also A.H. Belo Corp. v.
Sanders, 632 S.W.2d 145, 146 (Tex. 1982); Southwest Guar. Trust Co. v. Hardy Road
13.4 Joint Venture, 981 S.W.2d 951, 954 (Tex. App.-Houston [1st Dist.] 1998, pet.
denied). 

 The Taubs contend these cases are limited to an action for slander of title, which
is not a cause of action on which they sued. "Slander of title" is defined as a false and
malicious statement made in disparagement of a person's title to property which causes
him or her special damages. Sadler v. Duvall, 815 S.W.2d 285, 293 (Tex. App.-Texarkana
1991, pet. denied), clarification denied, 828 S.W.2d 339 (Tex. App.-Texarkana 1992). The
requisite elements are: 1) the uttering and publishing of the disparaging words; 2) that they
were false; 3) that they were malicious; 4) that the plaintiff sustained special damages
thereby; and 5) that the plaintiff possessed an interest in the property disparaged. The
plaintiff must demonstrate the loss of a specific sale in order to recover. Hill v. Heritage
Res., Inc., 964 S.W.2d 89, 109-10, 115-16 (Tex. App.-El Paso 1997, pet. denied). While
not a slander of title case per se, this breach of contract, trespass, and fraud action seeks
recovery of damages due to the failure of the holder of the mineral leases to comply with
the terms of the Collateral Agreement, which is the same situation as presented in the
Modern Exploration case. The only difference is that the lawsuit in a slander of title case
is grounded on tort law principles, while this action is brought directly pursuant to the
contract. The duties in both cases arise from contractual relationships between the parties. 
Those duties in Modern Exploration arose from the lease; in this case, they arise from the
Collateral Agreement. We perceive no significant difference, especially where, as here,
the Taubs were paid by Enron for the granting of the 1994 surface rights and continued to
receive payments from the operation of the wells on their property. It is difficult to imagine
how the Taubs could establish damages by means other than a specific lost sale, due to
their continued belief at the time of the Enron negotiations that HPL still had viable
interests in sites 4M and 5M. As stated earlier, the plaintiff in a breach of contract action
must also demonstrate damages resulting from the breach. The Taubs failed in this
essential element of their cause of action for breach of contract.

 Even if the analogy to slander of title actions is not appropriate, HPL was entitled
to summary judgment on this issue under general principles of law pertaining to damages. 
It is a general rule of law that the victim of a breach of contract should be restored to the
position it would have been in had the contract been performed. Determining that position
involves finding what additions to the injured party's wealth have been prevented by the
breach and what subtractions from its wealth have been caused by the breach. 
Interceramic, Inc. v. S. Orient R.R. Co., 999 S.W.2d 920, 927-28 (Tex. App.-Texarkana
1999, pet. denied); see also Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d 741, 760
(Tex. App.-El Paso 2000, no pet.). The measure of damages is just compensation for the
loss actually sustained. Stamp-Ad, Inc. v. Barton Raben, Inc., 915 S.W.2d 932, 936 (Tex.
App.-Houston [1st Dist.] 1996, no writ). The burden is on the complaining party to
establish his right to recover compensatory damages by proving he suffered a pecuniary
loss as a result of the breach. Copenhaver v. Berryman, 602 S.W.2d 540, 543 (Tex. Civ.
App.-Corpus Christi 1980, writ ref'd n.r.e.). The burden is on the plaintiff to allege and
prove the loss resulting from the alleged breach. Such loss must be established with a
reasonable degree of certainty and cannot be left to speculation. Wade v. Southwestern
Bell Tel. Co., 352 S.W.2d 460, 462 (Tex. Civ. App.-Austin 1961, no writ). In Wade, the
plaintiff sued the telephone company for loss of profits allegedly caused by Southwestern
Bell's omission of his office listing in the Yellow Pages. The trial court rendered judgment
for Southwestern Bell, and on appeal the Austin court affirmed, stating in part:

 There was no proof of loss of any particular piece of business. 
Appellant had not been in the practice of law but for a year or two and was
new to the practice and could not establish to any degree of certainty, his
loss, which the law demands, but such claim for loss as offered was wholly
speculative.


Id.


 Our prior opinion in Bellatti v. Holland Mortgage & Inv. Corp., 838 S.W.2d 261 (Tex.
App.-Texarkana 1992, no writ), supports this point, even though that case was based on
negligence rather than breach of contract. (1) In Bellatti, the plaintiff sought out the defendant
in an effort to refinance her condominium. Her original financing was at 13.93 percent, and
when the defendant was contacted, it was alleged that financing was available at 9.5
percent. One of the defendant's employees told the plaintiff the defendant would be willing
and able to make the loan, and she should obtain a title policy in preparation for closing. 
However, three months later, the defendant informed the plaintiff that the Federal Housing
Administration (FHA) required applicants to show a seventy percent or higher owner
occupancy rate in order to guarantee a loan, a requirement the plaintiff could not meet. 
She then attempted to obtain conventional financing or FHA financing through another
source, but was unsuccessful. The plaintiff alleged that the negligence of the defendant's
employee kept her from obtaining alternate financing when it was available, leaving her
with unnecessarily high loan payments. While the jury found some issues in favor of the
plaintiff, the trial court granted judgment notwithstanding the verdict at the defendant's
request. We affirmed, holding that the proof of damages submitted by the plaintiff did not
establish she could have obtained financing from some other source and that she failed
to demonstrate she was damaged by the defendant's employee's negligence. Id. at 263.

 The Taubs' only allegation, as stated in Henry Taub's deposition, was that, if they
had been aware HPL no longer had any legal interest in sites 4M and 5M, they would not
have entered into the 1994 Surface Use Agreement. They do not claim the loss of a
specific sale of the property, as would be required in a slander of title case. They also do
not give an opinion as to the loss in value of the slightly more than two acres in the 1994
Enron Surface Use Agreement, compared to the property's value without such surface
rights. On the other hand, Henry Taub admitted receiving payments for granting the
surface rights for exploration to Enron and admitted receiving continued payments from
ongoing mineral activity. 

 In addition to the failure to establish any basis for the calculation of damages, we
also fail to see how the alleged breach of contract by HPL caused the Taubs to do, or not
to do, anything detrimental to their interests. The undisputed deposition testimony shows
that Henry Taub had in his possession releases from HPL of the 2M, 4M, and 5M sites for
five to six weeks before signing the1994 Surface Use Agreement with Enron. He did not
testify that any sale of the property was pending at that time which hinged on the legal
status of the two-plus acres of land at the 4M and 5M sites; there is no other testimony
regarding additions to the Taubs' wealth that were prevented by HPL's breach, or
subtractions from the Taubs' wealth caused by the breach. 

 Whether by analogy to slander of title, or under general principles of law pertaining
to breach of contract and damages, there is no summary judgment evidence from which
a trier of fact could find the Taubs suffered any recoverable damages as a result of HPL's
alleged breach of its agreement. The Taubs may have suffered nominal damages, but
they did not allege such damages in their response to the motion for summary judgment.

 HPL also raised the affirmative defense of limitations. The limitations period on
actions for breach of contract is four years. Tex. Civ. Prac. & Rem. Code Ann.
§ 16.004(a)(3) (Vernon Supp. 2002); Morriss v. Enron Oil & Gas Co., 948 S.W.2d 858, 869
(Tex. App.-San Antonio 1997, no writ). The cause of action in a breach of contract
accrues when the contract is breached, Carlson v. Carlson, 983 S.W.2d 304, 307 (Tex.
App.-Houston [1st Dist.] 1998, no pet.), or when the claimant has notice of facts sufficient
to place him or her on notice of the breach. Lane v. State Farm Mut. Auto. Ins. Co., 992
S.W.2d 545, 549 (Tex. App.-Texarkana 1999, pet. denied). The Taubs contend that,
under the tolling agreement signed by the parties, dated May 8, 1996, and as later
supplemented and extended, the limitations period began to run on the four-year period
on May 8, 1992. Regarding the breach of contract action, the summary judgment evidence
shows HPL acknowledged a period of nonuse of the well sites in question for a 365-day
consecutive period between 1988 and 1990. Under the usual tolling of the limitations
period, the prescriptive period ran on the breach of contract action long before the
execution of the tolling agreement in 1996 and long before suit was filed in 1998. The
Taubs contend, however, that as to the breach of contract action the "discovery rule" is
applicable to toll the running of the limitations period. 

 As a general rule, a cause of action accrues when a wrongful act causes some legal
injury, even if the fact of the injury is not discovered until later and even if all resulting
damages have not yet occurred. Murphy v. Campbell, 964 S.W.2d 265, 270 (Tex. 1997). 
The "discovery rule" is an exception to the general rule that an action does not accrue until
the plaintiff knew, or in the exercise of reasonable diligence should have known, of the
wrongful act and resulting injury. Id. The discovery rule has generally been applied in two
types of situations: 1) in cases where the nature of the injury incurred is inherently
undiscoverable and the evidence of the injury is objectively verifiable; and 2) in cases of
fraud and fraudulent concealment. Id.; S.V. v. R.V., 933 S.W.2d 1, 6 (Tex. 1996). To be
"inherently undiscoverable," an injury need not be absolutely impossible to discover, nor
does it mean a particular plaintiff did not discover his or her injury within the prescribed
period of limitations. It is not dependent solely on the nature of the injury, but on the
circumstances in which it occurred and the diligence of the plaintiff. "An injury is inherently
undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations
period despite due diligence." S.V., 933 S.W.2d at 7. The Texas Supreme Court has
determined the discovery rule is applicable in many instances involving legal malpractice
because a lawyer's error could not be discovered by a person ignorant of the law, Willis v.
Maverick, 760 S.W.2d 642, 645 (Tex. 1988), and in certain types of medical malpractice
cases. Hays v. Hall, 488 S.W.2d 412, 414 (Tex. 1972) (plaintiff who underwent vasectomy
and was told he was sterile cannot know he is still fertile until either his wife becomes
pregnant or he undergoes further testing); Gaddis v. Smith, 417 S.W.2d 577 (Tex. 1967)
(physician leaves foreign object, such as a sponge, inside patient's body after surgery). 
In the Murphy case, the Texas Supreme Court determined faulty tax advice from
accountants was "inherently undiscoverable" in the same manner as if the advice was
dispensed by an attorney, because "it is most unlikely that a client would know that tax
advice was faulty at the time he received it." Murphy, 964 S.W.2d at 271.

 We hold the injury alleged in this case is not inherently undiscoverable. The alleged
injury involves tangible things: oil and gas exploration activities occurring on the surface
of land located in a metropolitan area. Whether drilling equipment is located on the
surface area is readily apparent by the mere viewing. Diligence is required by the owner
of the surface as to the operation of oil and gas leases, particularly where operation or lack
thereof at the lease site is legally significant. "Inherently undiscoverable encompasses the
requirement that the existence of the injury is not ordinarily discoverable, even though due
diligence has been used." Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456
(Tex. 1996) (emphasis added). "As owners of an interest in the mineral estate, the Neels
had some obligation to exercise reasonable diligence in determining whether adjoining
operators have inflicted damage." HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886
(Tex. 1998). In Neel, the court held the owner's obligation of due diligence went beyond
mere passive visual observation, but also extended to inquiries of the lessees as to their
activities. Id. The court also determined records filed with and available at the Texas
Railroad Commission could provide the requisite notice to the owners. Id. at 886-87. 

 The Taubs argue the nature of the activities conducted on the land in question
would not lend itself to being discovered by mere visual observation. As Neel holds, the
obligation goes beyond this and may include inquiries as to the nature of the operator's
activities. This is something the Taubs would be expected to do. The summary judgment
evidence indicates they are sophisticated and active participants in oil and gas matters. 

 As to whether there was fraudulent concealment such as to invoke application of
the discovery rule, fraudulent concealment is an equitable doctrine that provides an
affirmative defense to the plea in bar of limitations. The basic tenet of this defense is the
defendant's active suppression of the truth or its failure to disclose the truth when under
a duty to speak. The elements of fraudulent concealment are: 1) actual knowledge by the
defendant that a wrong has occurred; and 2) a fixed purpose to conceal the facts
necessary for the plaintiff to know that a wrong has occurred. AT&T Corp. v. Rylander,
2 S.W.3d 546, 557 (Tex. App.-Austin 1999, pet. denied). In a summary judgment
situation, the plaintiff has the burden of producing proof which raises an issue of fact with
respect to that claim. Santanna Natural Gas Corp. v. Hamon Operating Co., 954 S.W.2d
885, 889-90 (Tex. App.-Austin 1997, pet. denied).

 The same factors that made the injuries alleged here not "inherently undiscoverable"
also demonstrate the lack of fraudulent concealment. The well sites were in plain view on
the property, and the Taubs produced no summary judgment evidence indicating HPL
conducted its activities in such a manner as to pretend there was activity which, in fact, was
not occurring. Even if the legal status of property is a proper subject for misrepresentation,
there was no summary judgment evidence to indicate HPL was aware its interests in the
4M and 5M sites were subject to abandonment under the terms of the Collateral
Agreement, yet deliberately concealed this knowledge or belief from the Taubs. 

 We hold that, in addition to having no valid claim due to lack of cognizable
damages, any claim for breach of contract is barred by the applicable statute of limitations.

Trespass

 HPL contended in its motion for summary judgment that the Taubs' trespass claims
are also barred by limitations. The limitations period for a trespass action is two years. 
Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (Vernon Supp. 2002); First Nat'l Bank v.
Levine, 721 S.W.2d 287, 288-89 (Tex. 1986). The cause of action for trespass accrues
when facts come into existence which give a claimant a right to seek a remedy in the
courts. Fields v. City of Texas City, 864 S.W.2d 66, 68 (Tex. App.-Houston [14th Dist.]
1993, writ denied). The Taubs contend that, under the provisions of the tolling agreement,
the period of limitations began to run on May 8, 1994, two years before the date of the
execution of the tolling agreement. 

 The summary judgment evidence as to the period of inactivity that would have
terminated HPL's interest in the surface of the 4M and 5M sites (and thus caused a
trespass) is the same period during which any alleged breach of contract would have
occurred, i.e., between 1988 and 1990. In addition, the undisputed evidence indicates
HPL plugged its 4M and 5M sites no later than April 19, 1994, the date HPL executed a
partial release to the Taubs. Even if there was a trespass before that time, none occurred
for more than two years before the execution of the tolling agreement. As with the breach
of contract claim, application of the discovery rule is the only means of saving this claim. 

 The same summary judgment evidence cited with reference to the breach of
contract claim also establishes the alleged trespass was neither inherently undiscoverable
by the Taubs nor fraudulently concealed by HPL. The discovery rule would not, therefore,
be applicable, and we hold that the trespass claim is also barred by the statute of
limitations.

Fraud and Fraudulent Inducement

 HPL contended it was entitled to summary judgment on the Taubs' fraud and
fraudulent inducement claims because the evidence conclusively established: 1) there was
no misrepresentation; 2) there was no evidence of fraudulent intent; and 3) there was no
showing of reliance.

 To prevail on a fraud claim, a plaintiff must prove: 1) that the defendant made a
material misrepresentation; 2) that the defendant knew the representation was false or
made it recklessly as a positive assertion without any knowledge of the truth; 3) that the
defendant intended the plaintiff to act on the representation; and 4) that the plaintiff actually
and justifiably relied on the representation. Ernst & Young, L.L.P. v. Pac. Mut. Life Ins.
Co., 51 S.W.3d 573, 577 (Tex. 2001). 

 The deposition of Henry Taub was filed in support of HPL's motion for summary
judgment. In that deposition, Henry Taub testified that Warren Davis dealt with him to
acquire the surface rights in 1994 and that Davis worked for Enron, not HPL. Henry Taub
admitted that no one from HPL made any representations to him that were not true during
the relevant time period. While a corporation may be liable for its torts, the very nature of
a corporation is that it must act through its officers or agents. Cotton Belt R.R. v.
Hendricks, 768 S.W.2d 865, 870 (Tex. App.-Texarkana 1989, no writ). The Taubs do not
contend (and there is no summary judgment evidence showing) Davis was acting as the
agent for HPL when he negotiated the Surface Use Agreement with Henry Taub. 
Therefore, there is no issue of material fact that HPL made any misrepresentation. 

 The most significant reason why the summary judgment should be sustained on the
claim of fraud is the nature of the alleged misrepresentations themselves. Generally,
claims of fraud cannot arise from legal opinions. Fina Supply, Inc. v. Abilene Nat'l Bank,
726 S.W.2d 537, 540 (Tex. 1987); Gold Kist, Inc. v. Carr, 886 S.W.2d 425, 430 (Tex.
App.-Eastland 1994, writ denied); Bryant v. Transcon. Gas Pipe Line Corp., 821 S.W.2d
187, 190 (Tex. App.-Houston [14th Dist.] 1991, writ denied). Henry Taub testified Davis
told him 4M and 5M were "unused" sites, rather than "abandoned" sites; he stated a
surveyor's document showed that 5M was an "existing" site. These comments clearly refer
to the legal status of the sites, not to physical facts about the sites. A determinable interest
in real property, including an oil and gas interest, terminates automatically on the
happening of the contingency established when the interest was created. See generally
Harvey v. Alexander, 671 S.W.2d 727, 730 (Tex. App.-Fort Worth 1984, no writ); Black's
Law Dictionary 460 (7th ed. 1999). This change concerns only the legal status of the
land; nothing physical may have changed. Clearly, the misrepresentation, if any, pertained
solely to its legal, not physical, condition. 

 The law has recognized certain exceptions to this general rule: 1) where a party
having superior knowledge takes advantage of another's ignorance of the law to deceive
him by studied concealment and misrepresentation; 2) where there is a fiduciary
relationship between the parties; and 3) where misrepresentations involving a point of law
are intended to be misrepresentations of fact and are understood as such. Fina Supply
Co., 726 S.W.2d at 540. Henry Taub was not ignorant of the law; he worked with attorneys
on a continuing basis in his business and had been involved in many oil and gas cases. 
He was a sophisticated participant in the business and certainly would not have undertaken
a significant transaction in this area without legal counsel. Neither the Taubs and Davis,
the Taubs and Enron, nor the Taubs and HPL had a fiduciary relationship with each other. 
Further, we cannot say there is any genuine issue of material fact that the Taubs justifiably
relied on any representations made by Davis. As stated, Henry Taub was a sophisticated
participant in the oil and gas business. The Taub family and Enron are two sophisticated
business entities, dealing at arm's length, both with access to legal counsel. 

 The trial court correctly granted HPL's motion for summary judgment on the issues
related to fraud.

Civil Conspiracy


 An actionable civil conspiracy is a combination of two or more persons to
accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. 
The required elements to establish a civil conspiracy are: 1) two or more persons; 2) an
object to be accomplished; 3) a meeting of minds on the object or course of action; 4) one
or more unlawful, overt acts; and 5) damages as a proximate result. Lesikar v. Rappeport,
33 S.W.3d 282, 301 (Tex. App.-Texarkana 2000, pet. denied). The Taubs contend the
summary judgment evidence shows there is a genuine issue of material fact on their claim
of civil conspiracy between Enron and HPL. Specifically, they contend: 1) that Davis,
Enron's employee, acted in concert with HPL to defraud the Taubs by misrepresenting that
HPL and Enron had existing rights to use the 4M and 5M sites, and these rights would be
exchanged for the new Surface Use Agreement; 2) that the purpose and object of the
conspiracy was to procure the new Surface Use Agreement; and 3) that the alleged overt
act was the act of HPL in execution of the partial release of the 4M, 5M, and 9M sites,
which contained the representation that HPL had existing rights to these sites. 

 In support of their civil conspiracy claim, the Taubs direct us to an April 19, 1994,
memorandum from Davis to HPL, informing HPL that Henry Taub had requested a release
of abandoned surface sites and easements at the Bammel Field, in accordance with the
1966 Collateral Agreement. The memorandum stated HPL had plugged the 4M and 5M
sites, and had removed the heater equipment and pipeline from 9M. The Taubs further
contend that, by signing the partial release, HPL committed an overt act of fraud by
representing in such release that it owned existing drilling rights at the sites which had
been legally abandoned through inactivity.

 We disagree these two documents establish an overt, unlawful act in furtherance
of a civil conspiracy. The memorandum advised HPL the Taubs signed a surface
agreement with Enron pending the release. It refers to the 4M and 5M sites as
"abandoned," which is the status the Taubs contend these sites should have had under the
terms of the Collateral Agreement. The memorandum advised HPL those sites had been
plugged and the equipment had been removed. Further, the memorandum indicated
Henry Taub was the one requesting the releases, because he had been made aware of
the abandonment of these sites. 

 The only language in the partial release referring to the types of interests being
released appears in the "whereas" clauses, which refer to the release of "certain" rights. 
Since the release was apparently given at the Taubs' request, with full knowledge of HPL's
activities in removing the well from the site, we find this vague language does not constitute
an overt illegal act. 

 HPL contends, and we agree, that, given the nature of these two documents, the
Taubs cannot demonstrate how any representation about then-current rights would have
caused the Taubs to sign the 1994 Surface Use Agreement with Enron. We note the
partial release states it is made without warranty, recourse, or guaranty. It does no more
than convey whatever rights HPL had.

HPL's Right to Use the 6M Well Site


 The Taubs contend that, based on language in the Collateral Agreement, HPL's
right to use the 6M well site terminated and that the trial court erred in granting summary
judgment against them on this issue. The Taubs again rely on the language in the
Collateral Agreement providing that, if a well site was not used for "drilling, reworking,
storage, injection, repressuring, or production" for 365 consecutive days, HPL's right to use
the site automatically terminated. The Taubs argue that the issue is whether the 6M site
was used for injection, production, or storage. 

 HPL contends the trial court ruled correctly for the following reasons: 1) the Taubs'
challenge to affidavit testimony that the well was used for injection is a new issue on
appeal that was not raised in their response to HPL's motion for summary judgment; 2) the
summary judgment evidence established conclusively that the well was used for
production, injection, and storage; 3) equitable estoppel bars the Taubs' claim; and 4)
regardless, HPL was entitled to use the 6M site under adverse possession. In support of
its motion for summary judgment, HPL filed three affidavits as to the continuous use of this
well site from the time of HPL's acquisition until the time the well was plugged in 1996. The
continuous use described in these affidavits included the type of use required by the
Collateral Agreement ("drilling, reworking, storage, injection, repressuring, or production")
to prevent termination. 

 The Taubs' summary judgment evidence included the deposition of Lucius Geer,
who testified that, based on his review of certain "G9 records" filed with the Railroad
Commission during the time period 1977-1980, a 365-consecutive day period passed when
HPL failed to make one of the uses required by the Collateral Agreement to prevent
termination. In response, HPL attacks Geer's qualifications as an expert and the Taubs'
claim that the "G9 records" show a nonuse for the requisite time. However, HPL's attacks
go to the weight rather than to the admissibility of Geer's testimony. Further, HPL has not
directed us to any place in the summary judgment record where it objected to Geer's
deposition on the bases now asserted. Geer's deposition testimony is sufficient to raise
a genuine issue of material fact regarding the 6M site. 

 Nonetheless, HPL also raised the defense of equitable estoppel and correctly
contends the Taubs' response to its motion for summary judgment does not address this
argument. Where a nonmovant fails to respond to a ground for summary judgment, the
sole issue on appeal is whether the movant's summary judgment evidence was legally
sufficient. Johnson v. Levy, 725 S.W.2d 473, 476 (Tex. App.-Houston [1st Dist.] 1987, no
writ); Cox v. Bancoklahoma Agri-Serv. Corp., 641 S.W.2d 400, 402 (Tex. App.-Amarillo
1982, no writ).

 Equitable estoppel precludes the person estopped, because of that person's act,
conduct, or silence, from asserting a right which he or she otherwise would have. Forest
Springs Hosp. v. Ill. New Car & Truck Dealers Ass'n Employees Ins. Trust, 812 F.Supp.
729, 733 (S.D. Tex. 1993). As a general rule, equitable estoppel has been invoked by
mineral producers as an affirmative defense in situations, such as here, where there has
been a claimed violation of the mineral lease-usually some failure to engage in a required
production activity-which would result in cancellation of the lease, and yet the lessors
continue to receive payments or other benefits under the lease. Texas courts recognized
this principle as early as 1923:

 It is true that time is of the essence of oil and gas leases; that they are to be
construed most strongly against the lessee, . . . . Notwithstanding these
rules, however, the lessor, by practical construction, by permitting the
expenditure of large sums of money in development and by the acceptance
of royalties, however small, by his subsequent conduct . . . may waive his
right to declare a forfeiture. 


Masterson v. Amarillo Oil Co., 253 S.W. 908, 914-15 (Tex. Civ. App.-Amarillo 1923, writ
dism'd). 

 In Clark v. Perez, 679 S.W.2d 710 (Tex. App.-San Antonio 1984, no writ), cited by
the Taubs, the court states one cannot repudiate an instrument while simultaneously
retaining the payments received under the instrument. Id. at 715. In Young v. Amoco
Prod. Co., 610 F.Supp. 1479 (E.D. Tex. 1985), aff'd, 786 F.2d 1161 (5th Cir. 1986), the
plaintiffs continued to receive payments from one of the units despite claims the lease in
question had terminated. The court pointed out it is essential to the doctrine of equitable
estoppel that the person to be estopped had full knowledge of the real facts at the time of
the occurrence of the representation, concealment, or other conduct alleged to be the
basis of estoppel. Id. at 1487. The court further opined that, as such, the doctrine of
equitable estoppel contemplates it would be unconscionable to permit a person to maintain
a position inconsistent with one in which he has acquiesced, or of which he has accepted
the benefits with knowledge or notice of the facts or rights involved. When the basis of the
estoppel is the acceptance of benefits by the party to be estopped, the need for application
of the doctrine is supported by the rule that a person who accepts and retains the benefits
of a particular transaction will not thereafter be permitted to avoid its obligations or
repudiate the disadvantageous position. Id. The court further noted the assertion of a
waiver must be supported by proof of an intentional relinquishment of a known right or of
intentional conduct on the part of that person sufficient to warrant an inference of the
relinquishment of the right. Waiver by implication will be applied only to prevent fraud or
inequitable consequences and, thus, an implied waiver must be evidenced by clear,
unequivocal, and decisive acts from which can be inferred the intention to relinquish the
right. Id. at 1488-89. 

 HPL contends the "G9 reports" on file with the Railroad Commission, which
allegedly demonstrate inactivity such as would forfeit its rights in the surface at the 6M well
site, constituted notice to the Taubs, the surface owners. HPL points out the Taubs
continued to accept payments until the 6M well site was plugged and released with full,
albeit constructive, knowledge of the inactivity at well site 6M. 

 In Shivers v. Texaco Exploration & Prod., Inc., 965 S.W.2d 727, 735 (Tex.
App.-Texarkana 1998, pet. denied), we held that certain records of the Texas Railroad
Commission constituted "constructive notice" because they were matters of public record. 
Further, the Texas Supreme Court, speaking to the issue of whether records filed with the
Railroad Commission constitute "constructive notice," stated, "When the legal device of
constructive notice is employed, a person is deemed to have actual knowledge of certain
matters. Constructive notice creates an irrebuttable presumption of actual notice." Neel,
982 S.W.2d at 887. Citing Shivers, the Texas Supreme Court was only willing to conclude
that some records of the Railroad Commission, in certain circumstances, may provide
constructive notice. Id. at 887 n.1. However, the Texas Supreme Court continued, "filings
and other materials publicly available from the Railroad Commission are a ready source
of information, and a cause of action for failure to provide that same information is not
inherently undiscoverable." Id. at 887.

 While the "G9 records" of the Railroad Commission, standing alone, did not
constitute constructive notice to the Taubs, as constructive notice is viewed by the Texas
Supreme Court, we find these filings, combined with the lack of due diligence required of
the owners of land subject to mineral interests, as discussed above, did provide the
requisite notice, requiring the Taubs to take some action to protect their rights. Even with
this notice, the Taubs continued to accept the benefits from the mineral interests on their
property. We hold HPL established the affirmative defense of equitable estoppel.

 The Taubs also contend the trial court erred in holding HPL established by its
summary judgment evidence that it has title to its leasehold interest under a theory of
adverse possession. In Hill, 964 S.W.2d at 134, the court held mineral interests and oil
and gas leaseholds are treated as real property interests, and are subject to the rules
related to real property. Therefore, we hold the adverse possession rules are applicable
to such interests. 

 In its motion for summary judgment, HPL specified only the twenty-five-year
limitations period found in Tex. Civ. Prac. & Rem. Code Ann. § 16.028 (Vernon 1986). HPL
contends the Taubs' arguments concerning this defense are new on appeal and should be
disregarded. We agree. Therefore, as previously noted, the only proper inquiry is the legal
sufficiency of HPL's summary judgment evidence to establish adverse possession.

 A party claiming title by adverse possession must, at a minimum, prove: 1) actual
possession of the disputed property; 2) under a claim of right; and 3) which is adverse or
hostile to the claim of another. Sarandos v. Blanton, 25 S.W.3d 811, 815 (Tex.
App.-Waco 2000, pet. denied); see also Haby v. Howard, 757 S.W.2d 34, 37 (Tex.
App.-San Antonio 1988, writ denied). We hold HPL's summary judgment evidence is
legally insufficient because, while it demonstrated the required possession for the twenty-five-year period, it fails to show the possession was hostile for that requisite period. 

 Assuming the "G9 reports" establish the 365 consecutive days of nonuse such as
would constitute a forfeiture of HPL's rights, such period of nonuse would have ended, at
the outside, in 1980. Before that time, the possession was not hostile; it was under the
Unit Agreement, as supplemented by the 1971 partial release designating certain well sites
where production was to continue, and under the terms of the Collateral Agreement. Only
after the passage of the 365-day period in 1980 did the possession become hostile. 

 In order to establish adverse possession, the claimant must demonstrate, among
other things, that his or her possession of the land was hostile to the owner and that it was
consistently and continuously so for the duration of the statutory period. The test of
hostility is whether acts performed by the claimant on the land, and the use made of the
land, was of such a nature and character as to reasonably notify the true owner of the land
a hostile claim was being asserted to the property. Templeton v. Dreiss, 961 S.W.2d 645,
670 (Tex. App.-San Antonio 1998, pet. denied). 

 Since the summary judgment evidence fails to establish hostile possession for the
requisite time period, we hold this affirmative defense has not been established by HPL.

Trespass by Replacing Twelve-Inch Pipeline


 The Taubs contend the trial court erred in granting HPL's motion for summary
judgment on the issue of whether HPL had the right to remove an existing twelve-inch
pipeline in 1996 and replace it with a twenty-inch pipeline. In its motion for summary
judgment, HPL contended that the original lease agreement, entered into in the 1930s
permitting the laying of a pipeline, and the 1966 Unit Agreement, executed concurrently
with the Collateral Agreement, authorized the producer to use as much of the surface or
subsurface area as reasonably necessary for unit operations. In addition, HPL submitted
an expert's affidavit regarding the necessity of the installation of the larger pipeline, which
was to accommodate increased flows. 

 In response to the motion, the Taubs contended only that the pipeline width is
controlled by the Collateral Agreement. They did not challenge the expert witness
testimony. However, on appeal, the Taubs cite to a specific section of the Collateral
Agreement to which they did not refer in their response to the motion filed with the trial
court. They also make other contentions as to why the trial court erred in granting
summary judgment on this issue. 

 Issues not expressly presented to the trial court by written motion, answer, or other
response cannot be considered on appeal as grounds for reversal. Tex. R. Civ. P. 166a(c);
City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 674-75 (Tex. 1979); Gulf Ins.
Co. v. Clarke, 902 S.W.2d 156, 158 (Tex. App.-Houston [1st Dist.] 1995, writ denied). 
Additional grounds urged on appeal in opposition to HPL's motion are not appropriately
considered by the court. On this ground alone, we may not consider arguments raised for
the first time on appeal by the Taubs.

 Notwithstanding, we have reviewed the case of Houston Pipe Line Co. v. Dwyer,
374 S.W.2d 662 (Tex. 1964), cited by the Taubs, and find it distinguishable from the
situation presented in this case. In Dwyer, the plaintiffs, owners of the servient tenement,
sought declaratory and injunctive relief against the pipeline company's removal of an
eighteen-inch low-pressure pipeline from its easement, originally installed in 1926, and
replacement of that line in 1959 with a thirty-inch high-pressure pipeline. The court noted
the subject easement agreement contained no specifications for the size of the pipeline
and did not prescribe a metes and bounds description for the easement. The court granted
the relief, stating, "[w]e hold that when defendant constructed its 18-inch pipeline with the
consent and acquiescence of the plaintiff, the extent of defendant's [pipeline company's]
easement rights under the 1926 agreement became fixed and certain." Id. at 666. 

 As pointed out by HPL, the situation presented here is significantly different. The
original lease agreement signed in the 1930s authorized a pipeline. The Unit Agreement,
entered into shortly before the Collateral Agreement in 1966, authorized the operator to
use so much of the surface and subsurface as necessary to carry out its operations. 
Further, HPL cites to a portion of the Collateral Agreement which limited the size of the
easement to a maximum of fifteen feet in width. Unlike Dwyer, the summary judgment
evidence does not show that, by installing a twelve-inch pipeline, HPL's easement rights
became fixed and certain, preventing the installation of the larger line. This issue is
overruled.

 Having determined that HPL was entitled to judgment on one or more of the grounds
alleged in its motion, we affirm the summary judgment.




 Donald R. Ross

 Justice


Date Submitted: February 27, 2002

Date Decided: April 10, 2002


Publish

1. The essential elements of actionable negligence are: 1) the existence of a legal
duty owed by one person to another to protect the latter against injury; 2) breach of that
duty; and 3) damages 4) proximately resulting from that breach. 53 Tex. Jur. 3d
Negligence § 5 (1997).