**M.G. YOUNG, et al.,**

**v.**

**AMOCO PRODUCTION COMPANY.**

No. TY–82–390–CA.

United States District Court,
E.D. Texas,
Tyler Division.

June 11, 1985.

James N. Phenix, John R. Phenix, Henderson, Tex., for plaintiffs.

Rodney H. Lawson, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., Howard Coghlan, Kenley, Boyland & Coghlan, Longview, Tex., for defendant.

STEGER, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 13, 1984, came on for trial before the Court the above-entitled and numbered cause. Having heard the evidence presented and having duly considered all testimony, exhibits and arguments before it, the Court hereby enters these its Findings of Fact and Conclusions of Law in conformity with Fed.R.Civ.P. 52(a). Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law. Any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

## FINDINGS OF FACT

1. The Plaintiffs in this action are M.G. Young, Agnes Menefee, Mary Effie Smith, Margaret Ann Murray, Helen Griffin, James K. Young, Jack E. Young, Effie Downs, and Katherine Gray.

2. The Defendant herein is Amoco Production Company ("Amoco").

3. On May 4, 1950, Plaintiffs and/or their predecessors in title executed an oil, gas, and mineral lease (hereinafter referred to as "Lease # 1") in favor of Jack H. Meeks. Plaintiffs' Exhibit No. 2. This lease was for a primary term of ten (10) years and included six separate tracts. *See* Defendant's Exhibit No. 1. On that same day, Lease # 1 was assigned to the Defendant's predecessor, Pan American Production Company. Plaintiffs' Exhibit No. 3. Delay rentals were paid and received for Lease # 1 effective through May 23, 1957. Defendant's Exhibit No. 2. In April of 1956, the Carthage Unit No. V was established and included acreage covered by Lease # 1. *See* Plaintiffs' Exhibit No. 6.

The Carthage Unit No. V produced until July 26, 1963, at which time the well in this unit was plugged and abandoned. Plaintiffs' Exhibit No. 7. In July of 1956, the Carthage Unit No. VI was established and also included acreage covered by Lease # 1. *See* Plaintiffs' Exhibit No. 4. The Carthage Unit No. VI produced until June 12, 1963, at which time the well in this unit was plugged and abandoned. In March of 1960, the Mattie Horton Unit No. 1 was established. Plaintiffs' Exhibit No. 8. In April of 1960, the A.O. Menefee Estate Unit No. 1 was established. Plaintiffs' Exhibit No. 12. Both the Mattie Horton Unit No. 1 and the A.O. Menefee Estate Unit No. 1 included acreage covered by Lease # 1 and produced until January 1, 1962, at which time both of these units were absorbed into the Tatum Crane Water Flood Unit (hereinafter referred to as "Tatum Crane Unit"). Plaintiffs' Exhibit Nos. 9, 10, and 13. The Tatum Crane Unit continued to include acreage covered by Lease # 1. *See* Plaintiffs' Exhibit No. 10.

4. On May 4, 1950, Plaintiffs and/or their predecessors in title executed a second oil, gas, and mineral lease (hereinafter referred to as "Lease # 2") in favor of Jack H. Meeks. Plaintiffs' Exhibit # 14. This lease was also for a primary term of ten (10) years and included two separate tracts. *See* Defendant's Exhibit No. 1. Lease # 2 was also assigned to Amoco's predecessor, Pan American Production Company, on May 6, 1950. Plaintiffs' Exhibit # 15. The proper delay rentals were paid and received for Lease # 2 effective through May 4, 1960. *See* Defendant's Exhibit No. 3. As previously noted, the A.O. Menefee Estate Unit No. 1 was established in April of 1960 and began production. Acreage covered by Lease # 2 was included in this unit and was later absorbed into the Tatum Crane Unit. *See* Plaintiffs' Exhibit Nos. 12 and 13. All of the acreage covered by Lease # 2 is within the Tatum Crane Unit.

5. On April 23, 1953, Plaintiffs and/or their predecessors in title executed a third oil, gas, and mineral lease (hereinafter referred to as "Lease # 3") in favor of W.D. Morrow. Plaintiffs' Exhibit No. 16. This lease was also for a primary term of ten (10) years and contained only one tract. *See* Defendant's Exhibit No. 1. Lease # 3 was also assigned to Amoco's predecessor, Pan American Production Company, on May 11, 1953 and delay rentals were paid and received effective through April 23, 1961. *See* Plaintiffs' Exhibit No. 17 and Defendant's Exhibit No. 4. From February of 1961 until January 1, 1962, Lease # 3 was producing by means of the Minnie Bell Young Well No. 1. Plaintiffs' Exhibit No. 18. On January 1, 1962, this lease, along with the Minnie Bell Young Well No. 1 was absorbed into the Tatum Crane Unit. Plaintiffs' Exhibit No. 10. All of the acreage covered by Lease # 3 is within the Tatum Crane Unit. *Id.*

6. As noted above, the Tatum Crane Unit was established in January of 1961 and became effective on January 1, 1962. Plaintiffs' Exhibit Nos. 10 and 11. Subsequently, on April 26, 1961, Plaintiffs and/or their predecessors in title executed a Ratification of Unit Agreement regarding the Tatum Crane Unit. Plaintiffs' Exhibit No. 11. This ratification was made effective as of December 1, 1960. *Id.* The production, expense and revenue records indicate, as the parties have stipulated, that, at all material times, the Tatum Crane Unit has been commercially productive and that there has never been a cessation of commercial production from such Unit. *See* Defendant's Exhibit Nos. 6 and 7.

7. Each of the three leases in question contained a pooling provision which states as follows:

16. (a) Lessee is hereby granted the right and power, exercisable at any time and from time to time while this lease is in force and within 20 years from the date hereof, but not thereafter, to pool and combine the land covered by this lease, or any portion or portions thereof, as to all or any minerals or strata thereunder, situated in the same general area as the land covered hereby, so as to create a unit or units of such size in surface acres as Lessee may desire, and

prior to obtaining production from the pooled area to dissolve a pool theretofore created and to create a new pool or pools.

8. As is evident from the findings of the Court above, there appears to be little question that the production history on various tracts covered by the three leases in question has been extensive. However, Plaintiffs contend that Amoco has failed in its covenant to reasonably develop, explore and produce the Cotton Valley Sand gas formation apparently located under these tracts. As early as 1981, Amoco had already begun reviewing the development of that particular strata in the area covered by the leases in question. Under its plan for the proposed development of the Cotton Valley Sand under the tracts in question, Amoco authorized two proposed units. At that time Amoco was of the opinion that the three leases in question were being held by production from the Tatum Crane Unit. However, Amoco determined that, because of the twenty-year pooling provisions in these leases, additional pooling authority would be necessary to develop the Cotton Valley Sand. In an effort to gain the necessary pooling authority, Dudley Baskett, on behalf of Amoco, contacted the Plaintiffs in January of 1982 about executing lease amendments giving the additional pooling authority. The Plaintiffs were offered the same terms as all other landowners in the area, but refused to authorize additional pooling. Again, in April of 1982, the Plaintiffs were contacted by Mr. Baskett and by John Studdard, an Amoco landman, about giving the additional pooling authority to allow the development of the Cotton Valley Sand. Again, the Plaintiffs refused. Although the actual development of the leases in question has been abated pending the outcome of this action, Amoco has continued to negotiate with the Plaintiffs in an effort to obtain this additional pooling authority.

9. The proposed development by Amoco of the leases in question will be pursuant to the Dirgin Field Rules adopted by the Texas Railroad Commission for the development of the Cotton Valley Sand. *See* Defendant's Exhibit No. 8. These Rules provide for proration units of 160 to 704 acres. *Id.* Although the current plan is to drill two wells on the acreage covered by the leases in question, there is a possibility that, once production has begun, two additional wells might be drilled. Furthermore, pursuant to its plan for development of these leases, Amoco has entered into three contracts for the sale of the gas produced from the tracts in question.

10. Despite their claims that the leases in question have terminated and that Amoco has failed to reasonably develop the acreage in question, Plaintiffs have continued to receive and accept royalty payments from the Tatum Crane Unit.

11. The parties having stipulated to the following facts, the Court hereby adopts them as the Court's findings of fact:

a. There was commercial production attributable to each of the three leases made the basis of this action at the end of the primary term of each lease.

b. The Tatum Crane Unit has at all material times been commercially productive and there has never been a cessation of commercial production from said Unit.

c. There has never been a cessation of production attributable to any of the three leases in question.

d. The Plaintiffs have not suffered any monetary damages as a result of the allegations made the basis of this action.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties in this action.

2. As noted above, there is no dispute among the parties that, at the end of their respective primary terms, there was commercial production attributable to each of the leases in question and that, therefore, each lease was, by its own terms, being held by production.

3. However, although Plaintiffs admit that they and/or their predecessors

in title did execute the Ratification of Unit Agreement regarding the Tatum Crane Unit, they contend that while such Ratification may have authorized the formation of the Unit, it did not ratify the underlying leases. Such an argument is without merit. The Unit Agreement is clear and unequivocal in regard to the effect of said Agreement on the leases that become a part of the Unit. Paragraph 3.4 of the Unit Agreement states:

CONTINUATION OF LEASES AND TERM ROYALTIES. Operations, including drilling operations, conducted with respect to the Unitized Formation on any part of the Unit Area, or *production from any part of the Unitized Formation, shall,* except for the purpose of determining payments to Royalty Owners, *be considered as operations upon or production from each Tract and such operations or production shall continue in force and effect each lease or term royalty interest just as if such operations had been conducted and a well had been drilled on and was producing from each such Tract. Each such lease and term royalty interest shall remain in force and effect so long as this agreement remains in force and effect.* (Emphasis added).

Plaintiffs' Exhibit No. 10. This Court has found no authorities, and Plaintiffs have pointed to none, that would require an Agreement such as this to contain specific language of ratification concerning leases that were in force and effect by means of production.

The above-quoted section clearly evidences that production from lands anywhere within the Unit shall be considered production from each such tract within the Unit. This section also indicates that each lease shall remain in full force and effect so long as this agreement remains in force and effect. As previously mentioned, the three leases were being held by production at the time of the formation and ratification of the Tatum Crane Unit and at the time these leases were absorbed into said Unit on January 1, 1962. Lease # 3 was also still within its 10 year primary

term. Therefore, it was not necessary for the Plaintiffs' ratification of the Tatum Crane Unit Agreement to "revive" these three leases because all three leases were alive and valid at the time of the formation and ratification of the Tatum Crane Unit and at the time said Unit became effective on January 1, 1962.

4. The Plaintiffs further argue that the 20 year pooling clause in each lease operates to terminate all acreage pooled or unitized within this 20 year period upon the expiration of the 20 year period. However, they have presented no evidence or law in support of this contention.

■ In construing the particular pooling provisions of these leases, this Court recognizes that the anticipatory pooling power given the lessee in an oil and gas lease is necessarily broad. *Elliott v. Davis,* 553 S.W.2d 223, 226 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.); *Tiller v. Fields,* 301 S.W.2d 185 (Tex.Civ.App.—Texarkana 1957, no writ). Thus, the Texas courts have consistently adhered to the general rule that, in the absence of clear language to the contrary, pooling clauses in oil and gas leases should *not* be construed in a narrow or limited sense. *Mengden v. Peninsula Production Company,* 544 S.W.2d 643, 647 (Tex.1976); *Elliott, supra* at 226; *Texaco v. Lettermann,* 343 S.W.2d 726, 732 (Tex.Civ.App.—Amarillo 1961, writ ref'd n.r.e.).

■ The three leases made the basis of this action clearly state that the "Lessee is ... granted the right and power, exercisable at any time and from time to time while this lease is in force and within 20 years from the date hereof to pool and combine the land covered by this lease ..." Plaintiffs' Exhibit Nos. 2, 13, and 16, Paragraph 16(a). Furthermore, the leases also provide in Paragraph 16(c) that:

Any well drilled operations conducted on that part of a unit created hereunder which is not included in the land described in this lease, at depths down to and including the particular strata or depths unitized if so limited, shall be

considered a well drilled or operations conducted under this lease, and production from any such well of a unitized mineral or from a unitized stratum shall be considered, except as to the amount of royalty payable thereon, as production under this lease.

Accordingly, the Court is of the opinion that the language of these pooling provisions is clear: the Lessee can and must exercise the right to pool within 20 years from the date of the lease and, if he does so, any unit formed within this period that includes acreage covered by the lease would operate to hold the lease beyond such 20 year period so long as there is commercial production from that unit.

The evidence in this case firmly establishes that the Tatum Crane Unit was established and became effective well within the 20-year period. Plaintiffs' Exhibit Nos. 10 and 11; Defendant's Exhibit No. 5. Further, the evidence also clearly indicates that the leases in question have been held and are still being held by commercial production from the Tatum Crane Unit. Defendant's Exhibit Nos. 6 and 7. Therefore, the Court finds that, based on the relevant pooling provisions of the leases in question, production from the Tatum Crane Unit, formed and ratified by the Plaintiffs and made effective within 20 years from the date of said leases and which includes acreage covered by these three leases, operates to hold the leases beyond this 20 year term so long as there is commercial production from such Unit.

■ 5. The Texas courts have long recognized that the lessee in an oil, gas, and mineral lease, absent express provisions relieving him of these obligations, assumes a number of implied covenants in favor of the lessor with reference to the development and operation of the leasehold premises. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex.1981); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 693–95 (1959); *Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27 (1929); *Texas Pacific Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031 (1928); *Free-*

port Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039 (1928); *Exxon Co. v. Dalco Oil Co.*, 609 S.W.2d 281, 284–85 (Tex.Civ.App.—Corpus Christi 1980, no writ); *McCarter v. Ransom*, 473 S.W.2d 235, 238 (Tex.Civ.App.—Corpus Christi 1971, no writ). These implied obligations and duties are as much a part of the lease and are just as binding as though they were expressed. *McCarter, supra* at 238. *See also Clifton, supra; Freeport Sulphur Co., supra.*

■ The standard of care in testing the performance of implied covenants is that of a reasonably prudent operator under the same or similar circumstances. *Alexander, supra* at 567–68; *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex.1966). As the Texas Supreme Court explained in *Alexander:*

The reasonably prudent operator concept is an essential part of every implied covenant. Every claim of improper operation by a lessor should be tested against the general duty of the lessee to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease.

622 S.W.2d at 568.

■ Among these obligations imposed upon the lessee is the implied covenant to reasonably develop the leasehold premises. *Clifton, supra* 324 S.W.2d at 693. This implied covenant generally imposes a duty upon the lessee, once production has been discovered on the premises, to conduct further development with reasonable diligence, to the end that such operations would result in a benefit or profit for both the lessor and the lessee. *Id. See also Edgar v. Southwestern Oil & Refining Co.*, 377 S.W.2d 225, 228 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.). Consequently the lessee's obligation as to development is measured by this same reasonably prudent operator standard in that he is not required to begin or continue in the performance of such operations unless there is a reasonable expectancy of profit not only to the lessor, but also to the lessee. *Clifton, supra* at 695.

■ As with the other types of implied covenants, the required burden on the part of the lessor for proving a breach of the implied covenant to develop depends on the particular factual basis of the dispute between the lessor and lessee. *See Alexander, supra* at 567. From an examination of the record before the Court and the testimony, evidence, and arguments presented by Plaintiffs at trial, it is apparent that the essence of their complaint concerning Amoco's alleged nondevelopment is that Amoco has failed to be reasonably diligent in the development of the Cotton Valley Sand by drilling additional wells.

■ In claiming a breach of the implied covenant to reasonably develop by reason of the failure to drill additional wells, the lessor is required to prove:

(1) that the lessees failed to measure up to the standards of the prudent operator;

(2) that the producing strata or horizons, which the lessor contends should have been further explored or drilled, required additional wells;

(3) that the strata or horizons other than those from which production is being obtained (on which further exploration or drilling is sought), exists in reasonable probability; and

(4) that by the drilling of additional wells, there would be a reasonable expectation of profit, not only to the lessor, but also to the lessee.

*Clifton, supra* at 695; *Edgar, supra* at 228–29; *Felmont Oil Co. v. Pan American Petroleum Corporation,* 334 S.W.2d 449, 455 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.).

■ Ron Hinn, an Amoco engineer, testified that the initial development of this formation began in early 1980, but that most of the extensive development began in 1982. L.E. Ostrom, the Plaintiffs' expert, testified that a reasonably prudent operator would have begun development of the three leases by the Fall of 1982. Both Studdard and Hinn testified that Amoco authorized development of the Cotton Valley Sand in early 1981 and that it took

several months to clear the title before Amoco could attempt to form production units. John Studdard testified that it was then determined that Amoco would have to obtain *additional* pooling authority from certain landowners such as the Plaintiffs whose leases limited the *exercise* of pooling authority to the first 20 years of the lease. As mentioned earlier Studdard and Baskett both testified as to Amoco's efforts to obtain additional pooling authority from the Plaintiffs. The Plaintiffs were offered the same terms as all other landowners in the area, but refused. In fact, Studdard and Hinn both testified that the Plaintiffs' refusal to grant additional pooling authority is the only thing preventing Amoco from further developing the Cotton Valley Sand, and that Amoco has obtained the necessary additional pooling authority from the other landowners.

Amoco further indicated that it is already in the final stages of its plans for two proposed gas units that had been authorized in January of 1981. *See* Defendant's Exhibit No. 1, Proposed units—Garrett Gas Unit and Driver Gas Unit. Through these two proposed units, Amoco intends to develop the Cotton Valley Sand under the acreage covered by these leases. The proposed development will be under the Dirgin Field Rules adopted by the Railroad Commission, which permit proration units of 160 to 704 acres. While Amoco plans at this time to drill two wells on this acreage, Ron Hinn did not rule out the possibility that additional wells might be drilled once production has begun. In fact, L.E. Ostrom also testified that it was his recommendation that only two wells be drilled to develop this acreage.

Finally, Studdard and Hinn testified that further development of these leases has been put on hold due to this lawsuit filed by the Plaintiffs on June 16, 1982, in the midst of negotiations with the Plaintiffs for additional pooling authority.

Based on the foregoing, the Court is of the opinion that Amoco has in no way breached the implied covenant to reasonably develop under the leases in question.

Plaintiffs have presented no credible evidence that a reasonably prudent operator would have done any more than the amount of development currently completed by Amoco. To the contrary, as was readily apparent from the evidence presented at the trial, Amoco began its development of the Cotton Valley Sand around he same time as other operators in the area and, since that time, has expended large amounts of time, effort, and money into maximizing the development of this stratum to the benefit of all parties involved. As noted above, Plaintiffs' own expert in essence verified that the prior and contemplated development by Amoco were well in line with how a reasonably prudent operator would go about developing the acreage and strata in question. Accordingly, the Court finds that the Plaintiffs have failed to discharge their burden of proof and, therefore, are entitled to no recovery on these claims.

6. The Plaintiffs have further alleged that Amoco has placed a cloud on their title to tracts covered by the leases in question. Yet, Plaintiffs introduced no evidence at trial in support of such contention. Accordingly, the Court finds that Plaintiffs are not entitled to recover on this claim.

7. As noted above, Plaintiff Mack Young testified that he and the other Plaintiffs have continued to receive and accept royalty payments from the Tatum Crane Unit. Accordingly, Amoco contends that, by their continued acceptance of the royalty payments from the Tatum Crane Unit, Plaintiffs are estopped from asserting their claims that the leases have terminated and that Amoco has placed a cloud on their title to the lands covered by these leases. In order to establish equitable estoppel, the following must be shown:

(1) that the party made a false representation or concealment of material facts;

(2) that such representation or concealment was made with knowledge, actual or constructive, of those facts;

(3) that such representation or concealment was made to a party without knowledge, or the means of knowledge, of such facts;

(4) that the representation or concealment was made with the intention that it be acted upon; and

(5) that the party to whom the misrepresentation was made relied to his detriment.

*Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929 (1953); *Nichols v. Vantage Management Co., Inc.,* 638 S.W.2d 186 (Tex.Civ.App.—Dallas 1982, no writ); *Mandril v. Kasishke,* 620 S.W.2d 238 (Tex.Civ. App.—Amarillo 1981, writ ref'd n.r.e.); *Group Life & Health Ins. Co. v. Brown,* 611 S.W.2d 476 (Tex.Civ.App.—Tyler 1980, no writ); *Cattle Feeders, Inc. v. Jordan,* 549 S.W.2d 29 (Tex.Civ.App.—Corpus Christi 1977, no writ). It is essential to the application of this doctrine that the person to be estopped had full knowledge of the real facts at the time the representation, concealment, or other conduct alleged to be the basis of the estoppel. *Champlin Oil & Refining Co. v. Chastain,* 403 S.W.2d 376 (Tex.1966); *Hallmark v. United Fidelity Life Ins. Co.,* 155 Tex. 291, 286 S.W.2d 133 (1956); *Texas Employers Ins. Ass'n v. Bottoms,* 200 S.W.2d 418 (Tex.Civ.App.—Fort Worth 1947, no writ); *Williams v. Texas Employers Ins. Ass'n,* 135 S.W.2d 262 (Tex.Civ.App.—Waco 1940, writ ref'd).

As such, the doctrine of equitable estoppel contemplates that it would be unconscionable to permit a person to maintain a position inconsistent with one he has acquiesced in, or of which he has accepted the benefits of with knowledge or notice of the facts and rights involved. *Theriot v. Smith,* 263 S.W.2d 181 (Tex.Civ. App.—Waco 1953, writ dism'd). When the basis of the estoppel is the acceptance of benefits by the party to be estopped, the need for the application of the doctrine is supported by the rule that a person who accepts and retains the benefits of a particular transaction will not thereafter be permitted to avoid its obligations or repudiate the disadvantageous portions. *See Central Power & Light Co. v. Del Mar Conservation Dist.,* 594 S.W.2d 782 (Tex.Civ.

App.—San Antonio 1980, writ ref'd n.r.e.); *Mueller v. Banks,* 332 S.W.2d 783 (Tex.Civ. App.—San Antonio 1960, no writ); *Theriot, supra; Graham v. Caballero,* 243 S.W.2d 286 (Tex.Civ.App.—El Paso 1951, writ ref'd n.r.e.); *Simmons v. Clampitt Paper Co.,* 223 S.W.2d 792 (Tex.Civ.App.—Dallas 1949, writ ref'd n.r.e.).

In the case at bar, it is undisputed that, despite their claims that the leases in question have terminated and that the Tatum Crane Unit is invalid as to them, the Plaintiffs have continued to receive and accept royalty payments in connection with their interests in the Tatum Crane Unit. The Court recognizes that Amoco has presented no evidence that the Plaintiffs had any knowledge of Amoco's proposed plans for the development of the acreage covered by these three leases. Absent such knowledge, a claim of estoppel cannot be supported. However, once the Plaintiffs were contacted by Amoco concerning the plan for the two proposed gas units and the need for additional pooling authority to carry through with such plans, they became aware that Amoco was spending time and money in an effort to develop the leases. Plaintiffs were told by Amoco and other third parties that Amoco had already negotiated and entered into pooling agreements and lease amendments with other landowners in the area in preparation for the formation of the two units. Yet, with this knowledge of Amoco's efforts in developing the leases and despite their position regarding the status of the leases and the Tatum Crane Unit, the Plaintiffs continued to accept the royalty payments. Unaware of the Plaintiffs' intentions, Amoco worked diligently toward the formation of the two proposed gas units. The Court is thus of the opinion that the Plaintiffs are estopped from asserting their claims that these leases have terminated or that Amoco has unlawfully placed a cloud on their title to the lands covered by the leases. *See Socony Mobil Oil Corporation v. Belveal,* 430 S.W.2d 529, 534–35 (Tex.Civ.App.—El Paso 1968, writ ref'd n.r.e.). Further, by refusing to grant the additional pooling authority necessary for the development of the leases, the Plaintiffs have estopped themselves from contending that Amoco has failed to reasonably develop, explore, and/or produce the oil, gas, and other minerals under the leased acreage.

8. Further, in defense of Plaintiffs' claims, Amoco has asserted that this acceptance of benefits constitutes a waiver of their right to complain that the leases have terminated and that Amoco has placed a cloud on Plaintiffs' title to the tracts covered by such leases. Further, Amoco contends that the refusal of Plaintiffs to grant the necessary additional pooling authority to enable Amoco to further develop the Cotton Valley Sand under these tracts also constitutes a waiver of its claims that Amoco has failed to reasonably develop the leased acreage.

Under Texas law, it is well established that an assertion of waiver must be supported by proof of an intentional relinquishment of a known right by the person claiming that right or of intentional conduct on the part of that person which is sufficient to warrant an inference of the relinquishment of that right. *Wells Fargo Business Credit v. Ben Kozloff, Inc.,* 695 F.2d 940, 947 (5th Cir.1983); *Palmer v. Fuqua,* 641 F.2d 1146 (5th Cir.1981); *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Co.,* 416 S.W.2d 396 (Tex.1967); *Texas & P. Ry. Co. v. Wood,* 145 Tex. 534, 199 S.W.2d 652 (1947); *Cox v. Bancoklahoma Agri-Service Corp.,* 641 S.W.2d 400 (Tex.Civ.App.—Amarillo 1982, no writ); *Landrum v. Devenport,* 616 S.W.2d 359 (Tex.Civ.App.—Texarkana 1981, no writ); *Texana Oil Co. v. Stephenson,* 521 S.W.2d 104 (Tex.Civ.App.—El Paso 1975, no writ); *Bluebonnet Oil & Gas Co. v. Panuco Oil Leases, Inc.,* 323 S.W.2d 334 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.). As such, waiver implies an election on the part of the person to dispense with something of value or to forego some advantage that might have been demanded or insisted upon. *Bluebonnet Oil & Gas Co., supra* at 338. *See also Ada Oil Co. v. Logan,* 447 S.W.2d 205

(Tex.Civ.App.—Houston [14th Dist.] 1969, no writ). The question of whether a waiver has occurred is largely a question of the intent of the party possessing the right and may be express or implied. *Wells Fargo Business Credit, supra; Alford, Meroney & Co. v. Rowe,* 619 S.W.2d 210 (Tex.Civ. App.—Amarillo 1981, writ ref'd n.r.e.); *Cattle Feeders, Inc. v. Jordan,* 549 S.W.2d 29 (Tex.Civ.App.—Corpus Christi 1977, no writ); *Smith v. Northwest Natl. Bank,* 403 S.W.2d 158 (Tex.Civ.App.—Texarkana 1966, writ ref'd n.r.e.). However, waiver by implication is generally applied only to prevent fraud or inequitable consequences and, thus, an implied waiver must be evidenced by clear, unequivocal and decisive acts from which can be inferred the intent to relinquish the right or rights in question. *Blardone's Estate v. McConnico,* 604 S.W.2d 278 (Tex.Civ.App.—Corpus Christi 1980) writ ref'd n.r.e. 608 S.W.2d 618; *Jordan, supra; Commercial Credit Corp. v. Taylor,* 448 S.W.2d 190 (Tex.Civ.App.—Tyler 1969, no writ); *Smith, supra.*

 Having examined the record before it, the Court is of the opinion that the Plaintiffs' intentional conduct of continuing to accept the royalty checks from the Tatum Crane Unit once they had knowledge of the dispute between their position regarding the leases and the ratification agreement and that of Amoco's constitutes sufficient intentional conduct on their part to warrant the inference that they intended to relinquish certain of their rights under the leases. It is evident from the evidence presented that Plaintiffs were well aware of the provisions of the leases in question and their rights and obligations thereunder. Yet, with knowledge of those rights, they intentionally chose to accept the payments anyway. The Court therefore finds that the Plaintiffs' acceptance of the royalty payments constitute the clear, unequivocal, and decisive acts necessary to support an implied waiver of their rights in question.

* Pursuant to Fed.R.Civ.P. 25(d), Donald P. Hodel has been substituted for William P. Clark as

9. Having found that the leases in question are still being held by production and that Amoco has not failed in its duty to reasonably develop the leaseholds and, further, that Plaintiffs have waived and are estopped from asserting their claims herein by reason of their continued acceptance of royalty payments from the Tatum Crane Unit, the Court need not address the affirmative defenses of laches and limitations raised by Amoco.

10. Based on the foregoing, the Court finds that Defendant Amoco Production Company is entitled to judgment on each and all of the claims asserted herein by Plaintiffs.