**Opinion filed October 14, 2010**



# In The

# Eleventh Court of Appeals

_____

## No. 11-09-00056-CV

_____

**THOMAS ED COLE AND ROY FRANKLIN COLE,**
**Appellants and Cross-Appellees**

**V.**

**ANADARKO PETROLEUM CORPORATION AND**
**PERMIAN BASIN JOINT VENTURE, LLC,**
**Appellees and Cross-Appellants**

**On Appeal from the 161st District Court**

**Ector County, Texas**

**Trial Court Cause No. B-117,955**

## O P I N I O N

Thomas Ed Cole and Roy Franklin Cole filed a motion for rehearing which is granted in part. We withdraw our opinion and judgment dated July 22, 2010, and substitute our opinion and judgment dated October 14, 2010.

This suit arises out of a surface use dispute between the owners of the JY Ranch, Thomas Ed Cole and Roy Franklin Cole (the Coles), and the operators of a waterflood partially situated

on that ranch. The trial court granted multiple motions for partial summary judgment and certified an interlocutory appeal. We affirm in part and reverse and remand in part.

## I. *Background Facts*

H.E. and Rosa Lee Cummins executed an oil and gas lease in 1925 that covered 15 sections in Ector County. William Horace "Buster" Cole acquired the Cummins' interest in 1940. Atlantic Richfield Company (ARCO) became the operator for the 1925 Lease. In 1966, it created the Goldsmith Cummins (Deep) Unit (GCDU) to conduct a waterflood in the Clearfork Formation. Some of the tracts covered by the 1925 Lease were included within the GCDU. Buster and his wife Mary Cole ratified the GCDU Unit Agreement in 1967.

ARCO constructed a central battery facility to service the unit on 2.25 acres of land that is covered by the 1925 Lease and is within the GCDU's boundaries. Well fluid from GCDU wells is pumped to this facility where oil is separated and sold and water is reinjected. In 1984, ARCO entered into a surface lease agreement with Buster that added 1.18 acres to the central battery site for pipe storage and an emergency storage tank. In 1992, ARCO transferred its interest to Anadarko Petroleum Corporation.

The 1925 Lease gave Anadarko the right to construct and operate associated equipment such as pipelines and power lines and included a damage schedule. In 1995, Anadarko leased a .2778-acre tract of land in Section 33 that is within the 1925 Lease but is outside the GCDU's boundary for the construction of a water injection plant to service a second waterflood project. The 1995 lease was for a one-year term, and each succeeding year was automatically renewed for an additional year until terminated in writing by Anadarko. Buster was given the right to cancel the lease for nonpayment of the annual $500 rental after thirty days written notice of the default.

Buster passed away on October 1, 2000. He was survived by his wife and five children. Roy and Thomas are two of Buster's sons. Buster's will bequeathed his property to the Cole Family Master Trust. In 2001 and 2002, Roy and Thomas acquired the surface estate of the JY Ranch from William C. Cole, the Cole Family Master Trust, the Roy F. Cole 1995 Trust, and the Thomas Ed Cole 1995 Trust. The JY Ranch consists of approximately 18½ sections in Ector County. Most of the ranch is covered by the 1925 Lease, but only the southeastern portion is within the GCDU.

2

Anadarko made the 2002 and 2003 payments required by the 1995 Lease to Buster. On August 7, 2003, the Coles' attorney notified Anadarko that they were Buster's successors and that they intended to cancel the lease in thirty days for nonpayment of the 2002 and 2003 rentals. On August 18, Anadarko responded with copies of documents evidencing that it had mailed the 2002 and 2003 payments by certified mail and that the receipts had been signed by Mary Cole and William C. Cole but acknowledged that the checks had not been cashed. It asked the Coles to return the 2002 and 2003 checks and to provide evidence of the change of ownership. Anadarko also asked for a certified copy of Buster's death certificate, his will, and certain probate documents. The Coles' attorney replied on August 27 and indicated that he would request "any correspondence from the Coles to Anadarko pertinent to these issues." On September 12, the Coles notified Anadarko that the 1995 Lease had been cancelled for nonpayment.

On October 3, the Coles provided Anadarko with three special warranty deeds from the Cole Family Master Trust and William C. Cole to themselves and requested Anadarko to cease operations on the .2778-acre tract covered by the 1995 Lease. On November 6, Anadarko replied that the deeds were insufficient to document the ownership transfer because there was no documentation from Buster to the grantors, but it still forwarded two checks for $250 payable to Roy and Thomas and requested documentation of the transfer from Buster to the coexecutors of his estate. The checks reflect that they were intended as the 2003 rental payment. The Coles returned the checks to Anadarko, complaining that payment had been improperly conditioned upon a requirement that they procure Buster's probate documents.

The Coles filed suit against Anadarko in December 2003, alleging breach of contract causes of action. In 2007, Anadarko assigned its interest to Permian Basin Joint Venture, LLC. The Coles amended their petition and added Permian Basin as a defendant and also added causes of action based upon allegations of excessive and unauthorized surface use. The parties filed multiple motions for summary judgment. The trial court granted a motion for partial summary judgment filed by the Coles concerning the 1995 Lease, finding that Anadarko breached this agreement by failing to make annual rental payments of $500 and that the agreement terminated in 2003. The trial court also granted a motion for partial summary judgment filed by the Coles concerning Anadarko's surface use but denied the remaining motions. Prior to trial, however, the trial court reconsidered its surface use ruling and, instead, granted three partial summary

3

judgment motions filed by Permian Basin and Anadarko.  The trial court also announced legal findings concerning the 1925 Lease, the 1966 Unit Agreement, limitations, the Coles' standing to bring property damage claims, and Anadarko's breach of the 1995 Lease.  Finally, the trial court certified an interlocutory appeal pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(d) (Vernon 2008).

## II.  *Issues*

The Coles challenge the trial court's order with four issues.  They contend in Issues One and Two that the trial court erred when it construed Anadarko and Permian Basin's rights under the 1925 Lease and 1966 Unit Agreement and in Issues Three and Four that the trial court erred in its construction or application of the 1967 Agreement.  Anadarko and Permian Basin filed a cross-appeal.  They contend that the trial court erred by granting the Coles' motion for summary judgment on the 1995 Lease.

## III.  *Standard of Review*

We apply the well-recognized standard of review for traditional summary judgments.  Questions of law are reviewed de novo.  *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881 (Tex. App.—Austin 1999, pet. denied).  When cross-motions are filed and the trial court grants one and denies the other, we review all issues presented and enter the judgment that the trial court should have entered.  *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex. 1999).  To determine if a fact question exists, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented.  *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754 (Tex. 2007).  We must consider all the evidence in the light most favorable to the nonmovant, indulging all reasonable inferences in favor of the nonmovant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law.  *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546 (Tex. 1985).

## IV.  *The Coles' Surface Use Claims*

The Coles' surface use claims are predicated upon allegations that Anadarko and Permian Basin exceeded their rights under the 1925 Lease and the 1966 Unit Agreement.  The trial court found that the Coles lacked standing to bring any claim for property damage or unauthorized use that existed when they acquired the JY Ranch.  Because standing is a prerequisite to the trial court's subject-matter jurisdiction, *Bland Independent School District v. Blue*, 34 S.W.3d 547,

4

553-54 (Tex. 2000), we must review this finding before considering whether the 1925 Lease or 1966 Unit Agreement was violated.

Whether a court has subject-matter jurisdiction is a question of law and, therefore, is reviewed de novo. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Texas law is clear that a cause of action for injury to real property is a personal right that belongs to the person who owns the property at the time of the injury. *Senn v. Texaco, Inc.*, 55 S.W.3d 222, 225 (Tex. App.—Eastland 2001, pet. denied). A subsequent purchaser can acquire a property damage claim, but it must be specifically assigned. *See Vann v. Bowie Sewerage Co.*, 90 S.W.2d 561, 563 (Tex. 1936) (deed did not transfer the seller's property damage claim; therefore, the purchaser lacked standing). The Coles make no claim that their deeds conveyed their father's causes of action for property damages. Instead, they argue that they acquired his claims as his heirs and successors. The record does not corroborate this contention.

Buster's will devised his property to the Cole Family Master Trust. The Coles then acquired their interest from William C. Cole and three family trusts, including the Master Trust. The Coles testified that, in 1995, Buster created the Roy F. Cole 1995 Trust and the Thomas Ed Cole 1995 Trust and then conveyed a percentage ownership in the JY Ranch to them. The Coles also testified that Buster and the 1995 Trusts later conveyed the ranch to a limited partnership. The trust instruments and conveyance documents from these transactions are not in the record. How the family trusts reacquired the ranch is not clear. However, Anadarko does not challenge the Coles' title, and we accept it as established. What is more significant is that the Coles offered no evidence that, in any of these transactions, Buster assigned any property damage claim to the family trusts, that the trusts assigned any claim to them, or that Buster's property claims were otherwise assigned to them. The trial court, therefore, did not err by finding that the Coles lacked standing for any property damages accruing prior to their acquisition of the JY Ranch.[1]

The Coles do have standing to assert claims for damages accruing after their purchase, and they complain of the scope and extent of the activities that have taken place since their

[1]This holding makes it unnecessary to address the Coles' argument that Anadarko's use of the ranch for the central battery site was not authorized by the 1966 Unit Agreement or a 1967 Easement Agreement.

acquisition.[2] First, they complain that the trial court improperly found the ranch could be used to benefit other lands. Anadarko had the right to use as much of the surface of the GCDU as was reasonably necessary to produce oil or gas from wells located within that unit. *See Delhi Gas Pipeline Corp. v. Dixon*, 737 S.W.2d 96, 98 (Tex. App.—Eastland 1987, writ denied) (mineral owner can grant gas purchaser an easement to lay a pipeline to transport gas from a well on a production unit with which his tract has been unitized to the purchaser's pipeline but cannot grant the right to transport other gas across the surface owner's land); *see also TDC Engineering, Inc. v. Dunlap*, 686 S.W.2d 346, 348 (Tex. App.—Eastland 1985, writ ref'd n.r.e.) (lease covering an undivided one-sixteenth mineral interest in a 700-acre tract of land gave operator the right to dispose of brine produced from any well in that tract in a disposal well located on that tract).

The Coles correctly note that in *Robinson v. Robbins Pet. Corp.*, 501 S.W.2d 865, 867 (Tex. 1973), the court held that the operator could not use the surface of an 80-acre tract to operate a waterflood that included acreage outside the mineral lease covering this tract. But in that case, the unit was created after the surface owner obtained his title. The court noted that the surface owner obtained his title subject to a mineral lease and, therefore, subject to the implied right to use his surface to produce minerals covered by that lease. *Id.* at 867-68. But nothing in his chain of title subjected his estate to the burden of supporting production beyond that lease, and he had not otherwise consented to this greater burden. *Id.* at 868. Buster's ratification of the GCDU Unit Agreement in 1967 eliminates any question about the propriety of the original unitization, and the Coles took their interest subject to this ratification. The trial court, therefore, did not err when it found that Anadarko and Permian Basin were authorized to conduct all reasonably necessary uses of the surface of the ranch within the GCDU's boundary to benefit or effectuate the purposes of the unit – regardless of whether the production benefitted was from wells located on the ranch or the 1925 Lease.

But Anadarko does not have the right to lay a pipeline for the benefit of the unit on ranch land outside the GCDU's boundary absent condemnation proceedings or an easement. *Delhi Gas*, 737 S.W.2d at 98. The Coles testified that, in 2005, Anadarko installed one pipeline in

---

[2]The trial court found that the Coles' claims for trespass and trespass to try title with respect to the construction, operation, and use of the central battery site were barred by limitations. Our holding on standing makes it unnecessary to address this ruling. We do not read the trial court's order to dispose of any claims accruing subsequent to the Coles' acquisition of the ranch on the basis of limitations.

Section 33 and another that crossed Sections 33 and 34 and tied into the central battery facility. All of Section 33 is covered by the 1925 Lease, and portions are within the GCDU's boundary.[3] Installing a pipeline in Section 33, without more, is no evidence of a breach of duty. The Coles testified by affidavit that Anadarko failed to compensate them as previously agreed for this pipeline, but neither identified what agreement required compensation or what compensation was wrongfully withheld. Thus, to the extent the trial court's summary judgment order disposed of this claim, no error is shown.

The central battery pipeline crossing Sections 33 and 34 presents a different situation. While all of Section 34 is within the GCDU, most of Section 33 is not.[4] Roy testified that this pipeline was at least partially located outside the GCDU's boundary.[5] We do not read the trial court's summary judgment order as disposing of this claim on standing or limitations grounds. Because a portion of that pipeline is outside the GCDU's boundary, we also do not read the trial court's interpretation of the 1925 Lease and 1966 Unit Agreement as dispositive of this claim. If we are mistaken, the Coles presented sufficient summary judgment evidence to create a fact question on whether Anadarko exceeded its rights under the 1925 Lease and 1966 Unit Agreement to use the surface with its installation of this pipeline.[6]

The Coles also point to evidence of activities that occurred at the central battery facility, such as truck washing, parts and supply storage, and administrative functions that they contend were done in support of production both within and beyond the GCDU. Anadarko cannot use the surface of the GCDU to support activities outside the unit,[7] but the mere fact that incidental non-unit activities have taken place does not establish a cause of action absent evidence that

---

[3]Specifically, the 1966 Unit Agreement refers to tracts 27 through 29, which are described as the E/2 NW/4; W/2 NW/4; and W/2 SW/4 of Section 33, Block 45, T-1-N, T&P RR Co. Survey.

[4]The Unit Agreement refers to tracts 20 through 25, which are described as the NE/4 NE/4; SW/4 NE/4; S/2 NW/4; NW/4 NW/4; NW/4 NE/4; NE/4 NW/4; SE/4 NE/4; NE/4 SE/4; SE/4 SE/4; W/2 SE/4; SW/4 of Section 34, Block 45, T-1-N, T&P RR Co. Survey.

[5]A map attached to the Coles' brief indicates that the pipeline crossed the SW/4 of Section 33, which is not part of the GCDU.

[6]The trial court found that a 1967 Easement Agreement was valid and that the Coles breached it by not executing a tendered easement instrument. That easement was for the central battery site. The Coles' brief refers to a pipeline from the Laren Lease to the JY Ranch in its discussion of the 1967 Easement Agreement, but we do not read the trial court's order to address whether that agreement authorized Anadarko to lay a particular pipeline and express no opinion either.

[7]*Robinson*, 501 S.W.2d at 867 (operator cannot use the surface of one lease to benefit production from another lease).

7

these activities caused damage.[8]  *See Humble Oil Ref. Co. v. Williams*, 420 S.W.2d 133, 134 (Tex. 1967) (surface owner who seeks damages from the mineral lessee must prove negligence or that more of the land was used than was reasonably necessary).  When the surface owner claims the operator has exceeded its rights to use the surface, damages have traditionally been measured by the value of the excessive acreage used.  *See Stradley v. Magnolia Pet. Co.*, 155 S.W.2d 649 (Tex. Civ. App.—Amarillo 1941, writ ref'd) (operator used and occupied six acres more than was reasonably necessary for its full enjoyment of the minerals under its tract and, therefore, was responsible to the surface owner for the value of that acreage).

There was no evidence that Anadarko used more land for the central battery facility subsequent to the Coles' acquisition of the ranch.[9]  Thomas testified that, since 1992 when Anadarko acquired its interests from ARCO, he has noticed some sign changes and that some buildings were painted.  However, he could not describe any additional acreage utilized by Anadarko.  Roy testified that the central battery facility was there when he was a child and that he did not recall it being enlarged in the last twenty years.  Because the Coles produced no evidence of damage, the trial court did not err when it granted summary judgment against the Coles' claims for unauthorized activities at the central battery facility.

The Coles' issues are sustained in part and overruled in part.  The Coles established a fact question on whether Anadarko laid a pipeline in 2005 in support of the GCDU on lands outside the boundary of the unit and without their permission.  To the extent the trial court's summary judgment ruling disposed of this claim, the court erred.  In all other respects, the trial court's decision granting Anadarko and Permian Basin's partial summary judgment motions is affirmed.

---

[8]The Coles asserted that Anadarko breached the 1966 Unit Agreement and subsequent surface use agreements by conducting activities in support of non-unit production on acreage covered by the GCDU. They prayed for cancellation of the agreements, for recovery of possession of Sections 33 and 34, and for contractual damages. They also requested injunctive relief - but this was predicated upon the contention that Anadarko had no right to be on the JY Ranch. The Coles do not complain on appeal that the trial court erred by not terminating the 1966 Unit Agreement. Because the 1925 Lease and 1966 Unit Agreement are still in force, Anadarko and Permian Basin have some right to use the surface. It is, therefore, unnecessary for us to address the Coles' injunctive relief claims. We express no opinion on any other potential injunctive relief claim they might assert. We also express no opinion on whether a surface owner, confronted with activities in support of production off the lease or unit covering his surface but that do not result in more acreage being used, is entitled to injunctive relief barring that additional activity, a declaratory judgment on the extent of the operator's authority, contractual damages, or nominal damages. Our analysis is limited to the traditional measure of damages in surface use disputes: the value of the excessive acreage used. For this, the Coles offered no evidence that the additional activities resulted in additional acreage being used.

[9]The Coles raised the continuing tort doctrine in response to Anadarko's limitations argument. Our standing holding effectively moots Anadarko's limitations argument. But we note that the mere continuation of activities begun before the Coles' acquisition of the ranch, absent evidence of damage, is not a continuing tort because the injury to the land is permanent; therefore, the continuing tort doctrine is inapplicable. *See Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 443 (Tex. App.— Fort Worth 1997, pet. denied).

V. *1995 Surface Use Agreement*

The trial court found that Anadarko failed to make the annual rental payments required by the 1995 Lease and, consequently, that the 1995 Lease terminated on September 12, 2003. Anadarko argues this ruling was in error because it made the 2002 and 2003 lease payments in accordance with the terms of the lease, because equitable principles prohibit termination of the lease, and because a fact question exists on whether it breached the agreement. The Coles take issue with each of these positions but argue that we need not address them because it is undisputed that Anadarko failed to cure the 2002 payment default.

The record irrefutably establishes that Buster passed away in 2000; that the Coles acquired the JY Ranch in 2001 and 2002; that Anadarko made the 2002 and 2003 lease payments to Buster; that, in 2003, the Coles demanded payment of both the 2002 and 2003 annual rentals; and that Anadarko tendered only the 2003 rental payment. The Coles rely upon *Jackson v. United States Postal Service*, 611 F. Supp. 456 (N.D. Tex. 1985), for the proposition that this results in termination of the lease as a matter of law. The Postal Service leased space in a commercial building. Jackson notified the Postal Service that he had acquired the building and directed it to send all future rent payments to him. The Postal Service contacted the former owners to obtain verification and documentation of the ownership change, but they did not respond. The Postal Service suspended rent payments pending resolution of the ownership question. Jackson initiated a forcible detainer proceeding. The Postal Service then independently located a copy of the deed to Jackson, but it still failed to tender back rent. The Federal District Court held that the Postal Service's failure to tender back rent, once it ascertained that Jackson had acquired the building, was a breach of the lease agreement and that this breach entitled Jackson to possession of the premises. *Id.* at 460. The Coles argue that a similar result should follow here because, irrespective of how reasonable either side may have acted originally, Anadarko has long since confirmed the Coles' ownership but has yet to tender payment for 2002.

Anadarko concedes that its field personnel were aware of Buster's death;[10] but, because the 2002 and 2003 rental checks sent to him were never returned or challenged, Anadarko

---

[10]Michael Coder, Anadarko's Division Land Supervisor, attended Buster's funeral. Coder began dealing with the Coles as surface owners in December 2002, and starting in 2003, he paid them for surface damages to the ranch. Anadarko discounts these payments, contending that none were for the property covered by the 1995 Lease. However, on April 2, 2003, Coder forwarded a check for surface damages caused by two spills or leaks. The attached release indicated that one of the spills

contends that it was reasonable to believe that Buster's estate was still accepting those payments. Anadarko relies upon *Cartledge v. Sinclair Refining Co.*, 280 S.W.2d 312 (Tex. Civ. App.—Austin 1955, no writ), for the proposition that it was entitled to receive proper documentation of the transfer of ownership before being required to make any payments to the Coles. We agree with the analysis of *Cartledge*. Consequently, if we ignore the fact that Anadarko was already paying the Coles surface damages and was providing them with notice of Railroad Commission filings when it received their demand for the 2002 and 2003 annual rentals, Anadarko would clearly be entitled to confirmation of the Coles' title before being obligated to make lease payments to them. However, unlike *Cartledge* where the lessee never received confirmation of the ownership transfer, Anadarko obtained copies of Buster's probate documents on June 22, 2004. The question, thus, is did these documents impose any responsibility on Anadarko to pay the 2002 annual rental to the Coles?

The trial court correctly found that it did. When Anadarko obtained the probate documents in 2004, there was no longer any question that the Coles were entitled to the 2002 rental. Even though Anadarko may have correctly tendered the 2002 payment to Buster initially, because their check was never cashed and because the Coles' title was established, Anadarko breached the 1995 Lease when, after receiving the probate documents, it failed to tender the 2002 rental to the Coles or to at least place that money into the registry of the court.

The 1995 Lease gives the lessor the right to terminate the agreement for nonpayment after thirty days written notice.[11] Anadarko argues that equitable considerations preclude forfeiture because there was no evidence of willful or culpable neglect, and it cites *Sirtex Oil Industries, Inc. v. Erigan*, 403 S.W.2d 784 (Tex. 1966), in support of this contention. *Sirtex* involved a failure to pay a lease rental that the lessee, who acquired its interest by assignment from another operator, was innocently unaware of. There are three important distinctions

FOOTNOTE NO. 10 CONTINUED:

was in Section 34. This section is covered by the 1995 Lease. Moreover, Anadarko gave the Coles notice, as surface owners, of an H-1 and four H-1A applications it filed with the Texas Railroad Commission. Two of the H-1A applications were for wells on the same section as the water injection plant described in the 1995 Lease.

[11]The lease provides:

> As rental while this agreement is in force, Lessee shall pay to Lessor the sum of Five Hundred Dollars ($500.00) per year, annually in advance by mailing its check or draft to Lessor at Lessor's address as above stated. This agreement may be cancelled for nonpayment of rental only after thirty days written notice of default and such default continuing for such thirty day period.

between that case and ours. First, the surface lease in *Sirtex* did not have the unambiguous provision contained in the 1995 Lease allowing the lessor to terminate the agreement for nonpayment after thirty days notice. Second, Sirtex was unaware of the lease until it received a letter from the surface owners terminating the agreement and, thus, had no pre-termination opportunity to comply. Third, when Sirtex learned of the lease, it tendered the lease rental into the registry of the court.[12] Anadarko was aware of the 1995 Lease and, even after it confirmed the Coles' title, still failed to comply. We may not amend or disregard the terms of the lease.

Anadarko next argues that the Coles are estopped from terminating the 1995 Lease. Anadarko first contends that, because the Coles acted as though they would provide the documentation necessary to confirm their title, they may not now insist upon payment within thirty days of their original demand. In our analysis, we have focused upon Anadarko's obligation after receipt of the probate documentation in 2004. That analysis renders this contention moot.

Anadarko also contends that the Coles are estopped from termination of the lease because they have accepted royalties derived from activities conducted pursuant to the 1995 Lease. Equitable estoppel precludes one from asserting a right they would otherwise have because of their act, conduct, or silence. *Forest Springs Hosp. v. Ill. New Car & Truck Dealers Ass'n Employees Ins. Trust*, 812 F. Supp. 729, 733 (S.D. Tex. 1993). This is sometimes referred to as estoppel by election, *see, e.g., San Antonio Savings Ass'n v. Palmer*, 780 S.W.2d 803, 809 (Tex. App.—San Antonio 1989, writ denied) (one cannot accept the beneficial part of a transaction and repudiate the disadvantageous part), or quasi-estoppel, *see, e.g., Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 593-94 (Tex. App.—El Paso 2005, no pet.) (party may not accept the benefits of a transaction and subsequently take an inconsistent position to avoid corresponding obligations or effects).

Equitable estoppel differs from traditional estoppel in that it does not require a showing of a false representation or detrimental reliance. *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ). Equitable estoppel

---

[12]Anadarko also cites *Caranas v. Jones*, 437 S.W.2d 905 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.), for the proposition that equitable considerations will preclude a forfeiture even if the lease has a specific termination provision. In that case, the dispute involved the lessee's obligation to pay ad valorem taxes. The court found that forfeiture was inequitable because the lessee's obligation was unliquidated at the time of the lessor's demand. In this case, however, when the lessee's tax obligation was liquidated, it tendered the amount owed into the registry of the court. When Anadarko's obligation to the Coles was confirmed, it did not.

applies when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which it acquiesced or from which it accepted a benefit. *Cambridge Prod., Inc. v. Geodyne Nominee Corp.*, 292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet. denied). Texas courts have held that quasi-estoppel can preclude the exercise of a contractual forfeiture provision. *See, e.g., Taub v. Houston Pipeline Co.*, 75 S.W.3d 606 (Tex. App.—Texarkana 2002, pet. denied); *see also Cambridge*, 292 S.W.3d at 732 (mineral interest owners could not repudiate a unit designation after accepting royalties attributable to that unit).

The Coles acknowledged during their depositions that Anadarko spent considerable money installing the water injection plant and its associated pipelines, powerlines, tanks, and roads; that Anadarko used these facilities in a secondary recovery operation; and that they have accepted royalties generated by this operation. They argue, however, that this is insufficient to estop application of the lease forfeiture provision because Anadarko is commingling two separate and distinct agreements. The minerals on the JY Ranch have been severed. The 1995 Lease reflects an agreement between Anadarko and the surface owner, and it entitles the surface owner to an annual rental in exchange for the lessee's use of the surface. The 1925 Lease conveyed a fee simple determinable interest to the minerals, and it reserved a possibility of reverter and the right to receive royalty payments. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). The Coles contend that their actions have been in furtherance of their right as surface owners to receive the annual rental and that, absent inconsistent actions in pursuit of this right, estoppel does not apply.

The Coles are correct that the 1925 Lease and 1995 Lease are distinct agreements, but they are also closely related. Anadarko's use of the .2778-acre tract for a water injection facility benefited the Coles financially because of the annual surface rental but also because a secondary recovery operation could generate additional royalty. Consequently, it seems implausible that, when they originally advised Anadarko that the 1995 Lease had terminated and requested that it cease operations and remove its equipment, the Coles hoped Anadarko would immediately comply. It is more plausible that they hoped their leverage would lead to a new and more lucrative surface lease. Even so, this alone is insufficient to warrant imposition of estoppel.

Quasi-estoppel requires an initial action and a subsequent inconsistent action. *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied). The subsequent action is estopped because of its relation to the first. For example, one may not

12

accept the benefits of a transaction and then adopt an inconsistent position to avoid corresponding obligations or effects. *See, e.g., San Antonio Savings Assoc.*, 780 S.W.2d at 810 (estate beneficiaries could not keep funds advanced by savings and loan as part of an estate plan and simultaneously argue that the plan was void); *see also Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex. App.—Austin 1999, pet. denied) (parties could not solicit approval to act as successor operator under JOA and then contend that they were not bound by that JOA).

Traditionally, the doctrine has been applied in oil and gas cases when one party accepts the benefits from an agreement and then argues that the agreement is invalid. *See, e.g., Cambridge*, 292 S.W.3d at 732 (mineral interest owners could not accept royalties they received only because of unit operations and then contend that the unit designation was invalid).[13] Anadarko contends that the Coles' demand that it immediately cease operations and remove its water injection equipment is inconsistent with their subsequent decision to accept royalty payments that were, at least in part, generated by the continued operation of that equipment. The Coles, however, were entitled to the royalty because of the 1925 Lease. The amount of their royalty will obviously be impacted by Anadarko's surface operations, but their entitlement to it is not. The 1995 Lease entitled the Coles to an annual lease payment. There is no evidence that, after declaring the 1995 Lease terminated, the Coles accepted a lease payment or any other benefit they accrued only because of the continued viability of that lease. We recognize the hardball nature of the Coles' position, but the fact that they continued to accept royalty payments only acknowledges the continued validity of the 1925 Lease. They are not equitably estopped to

---

[13]*See also Young v. Amoco Prod. Co.*, 610 F. Supp. 1479, 1488 (E.D. Tex. 1985), *aff'd*, 786 F.2d 1161 (5th Cir. 1986) (plaintiffs were estopped to contend that leases had expired when they continued to accept royalties); *Reeder v. Wood County Energy L.L.C.*, No. 12-08-00175-CV, 2010 WL 2776081 at *5 (Tex. App.—Tyler July 14, 2010, n.p.h.) (party could not accept the benefits of being the unit operator and then claim it was not bound by unit JOA); *Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 608 (Tex. App.—Corpus Christi 2004, pet. denied) (party was estopped from contesting validity of farmout when it benefitted financially from that agreement); *Taub*, 75 S.W.3d at 624 (as a general rule, equitable estoppel has been invoked by mineral producers as an affirmative defense when there has been a claimed violation of the mineral lease, such as a failure to engage in a required activity, which would result in cancellation of the lease, but the lessors continue to receive payments or other benefits under the lease); *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 330 (Tex. App.—Fort Worth 1998, pet. denied) (party estopped from arguing that farmout agreement had terminated due to lack of production in paying quantities when it received royalties during the shut-in period and waited until after the shut-in had been released and gas sweeteners had been added to the well before initiating its action); *Clark v. Perez*, 679 S.W.2d 710 (Tex. App.—San Antonio 1984, no writ) (one cannot repudiate an instrument while simultaneously retaining the payments received under that instrument); *Masterson v. Amarillo Oil Co.*, 253 S.W. 908, 914-15 (Tex. Civ. App.—Amarillo 1923, writ dism'd) (the lessor may, by permitting the expenditure of large sums of money in development and by the acceptance of royalties, waive the right to declare a forfeiture).

13

declare the 1995 Lease terminated, and the trial court correctly found that it was terminated on September 12, 2003.

## VI. *Conclusion*

The judgment of the trial court is affirmed in part and reversed and remanded in part for further proceedings consistent with this opinion.


RICK STRANGE

JUSTICE


October 14, 2010

Panel consists of:  McCall, J.,
Strange, J., and Boyd, S.J.[14]

---

[14]John T. Boyd, Retired Chief Justice, Court of Appeals, 7th District of Texas at Amarillo, sitting by assignment.